**In re Walter Idus GEER, III, Debtor.**

**Philip Moyer, Plaintiff,**

**v.**

**Walter Idus Geer, III, Defendant.**

**Bankruptcy No. 12–73864–WLH.**

**Adversary No. 13–5155.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Signed Oct. 30, 2014.

Entered Oct. 31, 2014.

David Dormont, Kaufman, Coren & Ress, P.C., Philadelphia, PA, Douglas D. Ford, Quirk & Quirk, LLC, Atlanta, GA, for Plaintiff.

Howard D. Rothbloom, The Rothbloom Law Firm, Marietta, GA, for Defendant.

## ORDER

WENDY L. HAGENAU, Bankruptcy Judge.

This action under 11 U.S.C. §§ 727(a)(2) and (a)(4) alleges (i) the Debtor transferred and concealed assets to and through family trusts, an LLC and his family with intent to hinder, delay or defraud creditors, (ii) the Debtor made false oaths by omitting information from his schedules and statement of financial affairs, and (iii) the Debtor testified falsely at his 341 meeting, two depositions and at the trial of this matter. The Court concludes the Debtor is entitled to his discharge as explained in this opinion.

This dispute began with the involvement of Walter Geer III ("Debtor"), Philip Moyer ("Plaintiff") and others in a company known as Phenix Home Source, LLC ("Phenix Home") which purchased cabinet components from China and assembled them at a facility in Jasper, Georgia. With the decline in the housing market in 2008, Phenix Home failed. Plaintiff and the Debtor were co-guarantors on a loan at Georgian Bank, and Plaintiff had pledged securities as collateral for the loan. Upon Phenix Home's default, Georgian Bank called the guaranties. Plaintiff, rather than simply paying on the guaranty, arranged to purchase the note from Georgian Bank and then pursued the Debtor for the full amount of the guaranteed note, not just Debtor's contribution share. The Debtor also had guaranties on other business debt. In the meantime, the Debtor and his wife divorced, with the divorce being finalized in early 2012. All of the foregoing led to the Debtor's decision to file his bankruptcy petition under Chapter 7 on September 25, 2012.

The Debtor retained his brother, Will Geer, to represent him in filing the bank-

ruptcy petition.[1] Because both the Debtor and his attorney thought they knew each other so well through their familial relationship, it is safe to say that neither the Debtor nor his attorney shared as much information as they probably would have shared had each been dealing with a third party. It was also apparent to the Court from the Debtor's testimony that the Debtor was a "big picture" guy and not a detail-oriented person.[2]

The Debtor's statement of financial affairs ("SOFA") and full schedules ("Schedules") were filed contemporaneously with the bankruptcy filing. The Debtor testified at his 341 meeting on October 23, 2012, and then amended his SOFA and Schedules on November 1, 2012, November 15, 2012, and March 6, 2013. The Debtor also testified at a 2004 exam on March 7, 2013. On April 24, 2013, Plaintiff filed this adversary proceeding under 11 U.S.C. §§ 727(a)(2) and (a)(4). The Debtor was deposed again in this adversary proceeding on September 11, 2013.

The matter came before the Court for trial on July 21–24, 2014. The Debtor testified he relied heavily on attorneys and accountants, and did not review what was prepared for him by the various professionals. Throughout much of the trial, the Debtor blamed his brother, his father, his ex-wife, other attorneys, and accountants for any errors, omissions and misstatements. Ultimately, the Debtor recognized his responsibility for the transactions and disclosures at issue. The Debtor's failure to regularly review and understand materials provided by professionals, which he then signed, lead in many instances to the allegations of misstatements and omissions. Moreover, the course of this litiga-tion has been such that the Debtor is extremely defensive in his responses to Plaintiff's counsel. The Court notes, however, that in reviewing the original 341 transcript (Ex. 1), the Debtor was much more forthcoming and much less defensive.

The Court has jurisdiction of this matter under 28 U.S.C. § 1334 and this is a core matter under 28 U.S.C. § 157(b)(2)(J).

### FACTS

The parties stipulated to a number of facts [Docket No. 31], all of which are incorporated herein ("Stipulated Facts"). The Debtor graduated from the University of Georgia with a Bachelor of Arts degree in Political Science. He married Ann Geer ("Ann") in 1994. One of his closest friends is Jay Flowers, with whom he worked on various entrepreneurial ventures. Early on, the Debtor was CEO of eCompanyStore, Inc. In the spring of 2000, the Debtor received 4.4 million shares in eCompanyStore as a result of his sweat equity in the business. This represented about 50% of the common stock; outside capital received preferred stock. Additional investors were brought into the business over the years such that his interest was diluted to 2–3% of the company. In 2010, the company merged into Instawares Holding Company, LLC and the Debtor understood his shares were eliminated.

The Debtor resigned from eCompanyStore on December 31, 2003, and by 2005 began the company known as Phenix Direct LLC. His initial investor was Frank Murphy. Frank Murphy then introduced the Debtor to Plaintiff, who became an equity investor in Phenix Direct along with

---

1. As an aside, it is rarely a good idea to represent a family member or to retain a family member in a legal proceeding. This case is just such an example.

2. At the 341 meeting, the Debtor could not tell the Trustee what kind of phone he had or what kind of computer he had. His attorney/brother knew the answers to both.

Jay Flowers and others. The purpose of Phenix Direct was to import promotional products from Asia. In late 2005 or early 2006, the Debtor began investigating the idea of importing cabinet components from Asia for assembly and sale in Georgia. Phenix Home was born of this idea. Plaintiff, Murphy, Flowers and others continued their investment with the Debtor in Phenix Home. In addition to the equity investments in the company, Phenix Home obtained a loan from Georgian Bank for a line of credit to be used to buy inventory and to provide working capital to the company. The Debtor and Plaintiff executed guaranties, and Plaintiff collateralized the loan with securities.

The assembly of cabinet components was conducted at a warehouse located on Hood Road in Jasper, Georgia ("Hood Road Property"). The Debtor obtained the funding for the purchase of the Hood Road Property from Power Lending, described as a hard-money lender. The Debtor thought this loan was to Walt Geer LLC, a company the Debtor wholly owns, and that the property was purchased in the name of Walt Geer LLC. The acquisition of the property was 100% financed by Power Lending, including improvements, and the Debtor contributed no money to the purchase of the Hood Road Property. Notwithstanding the Debtor's understanding, the Court finds the Hood Road Property was purchased in the name of the Debtor individually and was never transferred from the Debtor's individual name to Walt Geer LLC. Phenix Home apparently leased the property from the Debtor/Walt Geer LLC with the rent being used to fund the loan payments to Power Lending.

Phenix Home also borrowed money from Advance Financial on an asset-based loan in the approximate amount of $250,000 to $300,000. Advance Financial then took a lien on Phenix Home's inventory and receivables. The Debtor was a guarantor. As of 2008, Phenix Home owed money on a line of credit to Georgian Bank, owed money on an asset-based loan to Advance Financial, owed money to the Debtor/Walt Geer LLC for the rent on the Hood Road Property, and owed money to its investors.

In 2008, as the real estate market in Atlanta crashed, the demand for home cabinets also declined significantly. The Debtor and the various investors tried to sell the Phenix Home business to a third party, Trivest. Some aspects of the business were sold to Trivest in late 2008 or early 2009, but ultimately Phenix Home received no money from that purchase because Trivest deemed the business to be worthless. In early 2009, a former customer of Phenix Home wanted to purchase specific product. Phenix Home did not have the product, but had contacts with the suppliers. Since Phenix Home had no funds with which to purchase the inventory, the Debtor notified Jay Flowers and other members of the board of the opportunity to purchase the inventory with their own money and sell it to this former Phenix Home customer. This transaction was anticipated to result in a profit. Jay Flowers purchased the inventory with his own funds and filled the customer's order. The inventory which was sold to the customer by Jay Flowers was not inventory already owned by Phenix Home, but rather inventory purchased specifically for the customer by Jay Flowers. Ultimately, Jay Flowers and the Debtor made a profit on the sale of this inventory.

Around the same time, Georgian Bank called the loan to Phenix Home and made demand on Plaintiff and the Debtor for payment on the guaranty, and Advance Financial demanded payment on the asset-based loan, which was also guaranteed by the Debtor. Finally, with Phenix Home

unable to pay rent to the Debtor/Walt Geer LLC, the Debtor/Walt Geer LLC defaulted on the real estate loan to Power Lending, for which the Debtor was also personally liable.

Plaintiff purchased the Phenix Home loan from Georgian Bank and then began pursuing the Debtor, not just for a contribution share of the loan but for the full amount. Advance Financial approached the Debtor about assisting Advance Financial in the liquidation of its collateral. One of Phenix Home's former employees, Darrell Morris, had, in the meantime, started Precision Cabinets. Advance Financial, Darrell Morris and the Debtor agreed that the Advance Financial inventory of cabinets and components would be sold through Precision Cabinets on consignment. Later, it was decided the inventory would be sold through the Debtor and Rick Leaman. Advance Financial then "sold" its collateral to Walt Geer LLC pursuant to a bill of sale. The Debtor understood Advance Financial "advanced" funds to Walt Geer LLC so it could "purchase" the inventory, with Phenix Home's debt paid in full, leaving Walt Geer LLC liable to Advance Financial and its debt still secured by the inventory and guaranteed by the Debtor. The proceeds of the cabinet sales, though, went to Advance Financial to reduce the loan. The Debtor and Rick Leaman created a website called eCabinetLiquidators.com on which they sold, or advertised for sale, the cabinets that were Advance Financial's collateral. eCabinetLiquidators.com was not a separate company but a website and Twitter handle used to sell Advance Financial's collateral. It was used primarily by Rick Leaman.

Ultimately, Power Lending went into financial distress itself, and its lender, RBC, had a receiver appointed for Power Lending, Chris Tierney. Mr. Tierney rejected the workout arrangement the Debtor had previously reached with Power Lending, at which point the Debtor "walked away" from the Hood Road Property. Pickens County conducted a tax sale of the Hood Road Property on November 2, 2010, selling the property to Energy Way Corporation. Energy Way re-conveyed the property to Power Lending on January 4, 2011, presumably when Power Lending redeemed the property. On May 11, 2011, Power Lending re-conveyed the property to the Debtor, presumably in preparation for the foreclosure conducted on November 1. (Ex. 116). Nevertheless, the record shows that, because RBC through Power Lending did not foreclose on the Hood Road Property until November 1, 2011, the Debtor's signature continued to be required by Power Lending/Tierney on various documents as the owner of the property. After the foreclosure, RBC confirmed the sale in accordance with Georgia law and the Debtor lists RBC as a creditor in his Schedules in the amount of $1 million for the deficiency.

The Debtor ceased drawing a salary from Phenix Home at some point in 2009. He sold his home and in April 2009, he bought the house located at 16056 Henderson Road, Alpharetta, Georgia ("Henderson Road Property") for about $330,000. The Debtor testified he and his wife bought the house "together". At the closing on the purchase of the house, the Debtor signed a note and security deed as the sole obligor and initially took sole title to the house. Simultaneously, though, the Debtor transferred his sole interest to himself and Ann as joint tenants with the right of survivorship. The Court finds that the Debtor's statement he and his wife bought the house "together" was a layman's understanding of the transaction, since the transfer of title to the Debtor and then to the Debtor and his wife jointly

occurred at the same closing and all as part of one transaction.

In March 2010, the Debtor entered into a series of transactions on the advice of counsel (not his brother) as part of an estate plan. These three transactions form the basis of Plaintiff's primary complaints. First, on March 24, 2010, the Debtor transferred his remaining interest in the Henderson Road Property to his wife, Ann. On the same day, Ann transferred the house to a qualified residential property trust of which the Debtor was the trustee ("QRPT"). The Debtor, however, was not a beneficiary of the QRPT; only his wife and children were.[3] The Debtor, Ann, and the children continued to live in the Henderson Road Property until the events described below in connection with the divorce. The Debtor remained solely liable on the mortgage. As of the petition date, the QRPT continued to hold title. The Debtor testified he believed the value of the property was less than the debt while Ann testified she believed the house was worth more than the debt. No valuation evidence was presented. The trustee never asserted a claim to the Henderson Road Property. The Debtor did not identify the Henderson Road Property as his property on Schedule A of his bankruptcy Schedules, but identified the mortgage debt in Schedule F. Schedule F included the information that the Henderson Road Property was in a QRPT and the address of the house. The Trustee made inquiries regarding the QRPT and the Henderson Road Property at the 341 meeting, all of which the Debtor answered truthfully. The Debtor did not identify the Henderson Road Property in answer to SOFA Question No. 14, which asks for a description of property held for another person.

In addition to the QRPT, the Debtor established the 2010 Geer Family Trust ("GFT"). The Debtor is the settlor of the GFT, but not a beneficiary. The beneficiaries are the Debtor's spouse (for as long as she is the spouse), children, parents and siblings. (Ex. 75). The trust document is executed as of January 1, 2010, but the Debtor testified it was actually executed in the summer of 2010. The GFT is irrevocable and contains spendthrift provisions. The Debtor is treated as owner of the GFT for tax purposes because it is a grantor trust. The Debtor initially transferred $1,500 into the GFT on September 30, 2010. There was discussion among the Debtor, his attorney and his father about transferring life insurance proceeds into the GFT, although it does not appear that ever occurred. The original trustee of the GFT was Will Geer, the Debtor's brother and bankruptcy lawyer. But on June 22, 2011, Will was removed as trustee and the Debtor's father was appointed trustee.

The GFT bank statements went to the Debtor's address until December 2010. Thereafter, the bank statements were delivered to addresses not identified as the Debtor's. (Exs. 22, 23). No evidence was presented that the Debtor was a signatory on the GFT bank accounts. The only checks admitted into evidence were signed by the Debtor's father. (Ex. 24). Once the Debtor's divorce from Ann was finalized, under the terms of the trust, she was no longer a beneficiary of the GFT. As of the petition date, the GFT held approximately $2,000 in a bank account, although the Debtor testified at his 341 meeting that, to his knowledge, the GFT held nothing.

---

**3.** The trust document was not introduced into evidence. There was no evidence to dispute the Debtor's testimony that he was not a beneficiary of the trust and that his wife and children were the sole beneficiaries.

The third entity formed by the attorney was Red Barchetta, LLC ("RB"). RB was originally formed in the summer of 2010 as a Delaware corporation, with the Debtor owning 2% and the GFT owning 98%. The parties executed an Operating Agreement in July 2010. (Ex. 76). The business was capitalized with $1,000 from the GFT, which was provided by the Debtor. The Debtor is the sole manager of RB and "acting alone, . . . [has] complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding such matters, and to perform any and all other acts or activities related to the management or the carrying out of the Company's business." (Stipulated Fact No. 18). When RB was formed, the Debtor opened a bank account for it on which the Debtor is the sole signatory. RB filed separate tax returns. (See, e.g., Ex. 36).

After the Debtor ceased his work with Phenix Home, he began consulting with small businesses in distress. He originally used the name Core Advisory Services as his DBA, although it was never incorporated. One of the Debtor's largest and most prolonged consulting arrangements was with PictureU Promotions ("PictureU"). The Debtor was retained initially as an independent consultant, and became a contract executive, serving as PictureU's president. The purpose of forming RB was to provide LLC protection to the Debtor as he performed these consulting arrangements and to obtain tax advantages. RB did on at least one occasion use two other individuals to assist with consulting engagements, although the vast majority of the work was performed by the Debtor. All of the Debtor's consulting earnings were paid through RB beginning October 2010. The Debtor did not receive a salary from RB but paid his personal expenses through RB or wrote himself a check to cover his personal expenses.

The Court finds from its review of Plaintiff's Exhibit 20 that from September 2011 through September 2012, RB (by the Debtor) wrote checks from its account totaling $262,938. Of this, the Debtor was paid roughly $175,450, Ann was paid $9,592, the GFT was paid $33,090, taxing authorities were paid $33,000, and the Debtor's children's school and dance studio were paid $4,809. The balance paid legal and accounting expenses and miscellaneous business expenses. None of the checks exceeded $5,850 [4] except for those to the Debtor, Ann, the GFT and the taxing authorities. During this same time period, the Debtor disbursed funds from RB's account through on-line bill pay and the use of a debit card totaling $49,803.73. None of these additional expenditures exceeded $5,850. The expenditures were mostly for restaurants, food, gas and car payments and in payment of Verizon, Comcast and American Express bills.

In late 2010, the Debtor and his wife separated. Divorce proceedings began thereafter. Although the Debtor was initially represented by counsel in the divorce, he was not represented by counsel by the conclusion of the divorce. His wife remained represented. The divorce decree was entered by the Superior Court on February 9, 2012 ("Divorce Decree"). (Ex. 87). It is extensive and prompts questions about the Debtor's Schedules and SOFA. The division of property that is set out in the Divorce Decree was not initially disclosed in the Debtor's Schedules. For example, the Divorce Decree contains a separate paragraph addressing

---

**4.** SOFA Question No. 3b only asked the Debtor to disclose transfers made within 90 days of the petition date that exceed $5,850.

the Debtor's interest in eCompany-Store/Instawares Holding Company, LLC. The Divorce Decree states as follows: "The parties agree that the approximately 4,418,722 shares Husband holds in eCompanyStore, Inc./Instawares Holding Company, LLC shall remain titled in his name; however, in the future, if Husband sells or otherwise conveys said shares any net sales proceeds shall be divided with Wife receiving 50% and Husband receiving 50% of the net, after tax sales proceeds." (Ex. 87). Nevertheless, the Debtor did not identify his interest in that company in response to any of the questions on the SOFA or Schedules. The Debtor testified he signed the Divorce Decree even though he knew he did not have the shares because, since he did not own the shares, a promise to pay 50% of any sales proceeds "didn't matter". Under the Divorce Decree, certain personal property was divided, any money in joint bank accounts was divided and Ann was to receive the Debtor's IRAs. The Debtor was obligated to make alimony payments, to pay certain car expenses, and to pay certain credit card debt. The Debtor was required by the Divorce Decree to pay Ann $4,000 "from" the Debtor's business interests in RB, Walt Geer LLC, Core Advisory Service, Phenix Home, Core Rewards and 16056 Inventory Management LLC. None of these transactions were identified in response to SOFA Question Nos. 3 or 10a.

Important to this proceeding, the Divorce Decree addressed the Henderson Road Property extensively. The Divorce Decree recognized the house was owned by the QRPT (of which Ann was a beneficiary), but provided a mechanism for the Debtor's ex-wife to obtain a share of the purported equity. It provided that the parties would immediately list and sell the Henderson Road Property. In no event was Debtor's ex-wife required to sell the house at a price that yielded less than $50,000 in net sale proceeds to her. The agreement obligated the parties to take any and all actions necessary to clear title to the house from the QRPT to any buyer at closing. The agreement further provided the Debtor with three options with respect to the Henderson Road Property which could be taken prior to sale. First, the Debtor could refinance the mortgage on the house and pay his ex-wife $50,000. Second, the Debtor could obtain two appraisals of the house, average the values and in accordance with the formula set forth in the Divorce Decree pay his ex-wife the greater of $50,000 or the equity in the house. The Debtor's third option was, beginning January 1, 2015, if the house had not otherwise been sold, the Debtor could reduce the sale price in accordance with a formula set forth in the Divorce Decree. In that event, his ex-wife would receive 100% of the net sales proceeds up to the sum of $50,000. Any sales proceeds in excess of $50,000 were to be held by the Debtor and applied toward the children's college education expenses. In all events, the Debtor's ex-wife was to receive at least $50,000 from the disposition of the house, and she could require the dissolution of the QRPT.

The Debtor moved out of the house and did not reside there when the petition was filed. In the 90 days prior to the filing of the bankruptcy petition, several events occurred with regard to the Debtor, the Henderson Road Property, and Ann. First, Ann decided she wanted to build a new house and needed money to bind the contract. She asked the Debtor for money. The Debtor, as manager of RB, wrote a check to the GFT for $9,000 on July 30, 2012. The GFT paid $7,203.00 on Ann's behalf to bind the house contract. Several weeks later, Ann needed additional money to deposit for the purchase of the home, this time asking for $20,000. Exhibits 20

and 24 show that RB transferred $19,600 to the GFT on September 10, 2012, and $490 on September 12, 2012, and the GFT then transferred $2,312 to Ann on September 6, 2012 and $20,000 to her on September 10, 2012. The Court finds Ann initiated this transaction, not the Debtor. The Debtor held no interest in Ann's new house.

The nature of the transaction changed throughout its course. On July 27, 2012, the Debtor sent his father an e-mail asking his father to request a $9,000 check from RB. The e-mail states, "We're gonna have the trust provide some money to Ann on Monday to help her get a contract on a new house." (Ex. 92). On September 6, 2012, the Debtor sent his father an e-mail asking him as trustee to authorize the Debtor to pay himself a distribution of $20,000 from RB. He states, "I will in turn pay this amount to Ann as a component of what I owe her from the divorce settlement." (Ex. 93). Twenty minutes later, the Debtor's father authorized the distribution. (Ex. 95). An hour and forty minutes later, the instruction changed from the Debtor's father so that now the $20,000 was paid as a distribution to the GFT. (Ex. 96). None of the transfers were identified in the SOFA or the Schedules, either as a payment on account of debt, a gift, a distribution, or otherwise. The transfers were, however, discussed at the 341 meeting. Later, in December 2012, Jay Flowers loaned the GFT $35,500, which it paid to Ann. Together with some of the funds transferred to Ann earlier, this satisfied the Debtor's obligations under Option (4) described below. Then, in March 2013, after the filing of the petition, Ann paid $20,000 back to the GFT. While the Debtor testified at the trial he did not know why she paid it back, according to Ann's deposition excerpt played at the trial, Ann testified she "thought" the Debtor asked her to pay it back.

On October 2, 2012, shortly after the bankruptcy filing, the Debtor and his ex-wife agreed to add "Option (4)" to the Divorce Decree as another means of funding the property settlement division of the Henderson Road Property with Ann. Option (4) allowed the Debtor to pay Ann $45,000 in full release of her interest in the house. Option (4) provided Ann with immediate access to the funds she needed to build a new house. Use of Option (4) did not require refinancing, appraisals, a sale or dissolution of the QRPT. The Debtor asked his friend Jay Flowers to write a check for $35,500 to the GFT to be paid to Ann for execution of Option (4). This check was written in December 2012 to the GFT, which then paid it to Ann. The combination of this check, and approximately $9,500 of what was paid to Ann pre-petition, fully funded the $45,000 to Ann and enabled the satisfaction of any interest she may have in the Henderson Road Property or the GFT. The Debtor moved into the Henderson Road Property post-petition where he continues to reside.

The Debtor did not identify any of the Henderson Road Property Options in the original Schedules or SOFA. In his March 2013 amendment to the Schedules and SOFA, the Debtor added in response to question 21 on Schedule B that "pursuant to February 2012 divorce decree, if Henderson Road property is sold in 2015, Debtor is to receive any amount of money above $50,000 in equity to hold in trust for his children's college education." The Debtor did not disclose either of the other two Options in the original Divorce Decree, nor Option (4) which was added in October 2012.

The Debtor began consulting with PictureU as interim president in March 2009. Some payments from PictureU in 2009 were made to the Debtor and others were

posted to Enterprise Incentive Services, Inc., a DBA the Debtor used, but payable to Core Advisory Services. No payments were made by PictureU to Enterprise Incentive Services in 2010, although accounting corrections were made on PictureU's books in 2010. PictureU made payments to Enterprise Incentive Solutions in 2011 and 2012, but none of the payments are labeled as consulting fees. Instead, the description of the payments is "software development", "technology royalties" and the like. (Ex. 50).

At the time the Debtor filed his petition, his compensation arrangement with PictureU was through RB. After RB's formation, all payments for the Debtor's consulting fees were paid by PictureU to RB. The consulting arrangement called for a flat monthly fee, plus a percentage of PictureU's financial improvement for the year. The Debtor testified at his 341 meeting that he was entitled to a bonus of between $70,000 and $80,000 at the end of 2012, based upon the performance to date of PictureU. By December 31, 2012, (post-petition), the Debtor ceased his consulting arrangement with PictureU, became a direct employee of PictureU, and

obtained a loan from PictureU in the amount of $100,000 which would be forgiven if the Debtor remained employed with PictureU through the end of 2014. Neither the Debtor nor RB received a 2012 bonus. Additionally, the Debtor had not submitted requests for reimbursement for expenses for several months as of the petition date. The Debtor had been using his father's credit card, as he had no credit cards available himself. Post-petition, the Debtor submitted the requests for reimbursement of expenses to PictureU for both pre- and post-petition expenses, and paid his father the amount that had been charged on the credit card.

The Debtor also used his father's credit card to take his daughters on a vacation in the summer of 2012. These vacation expenses were reimbursed to his father by the GFT with a check in the amount of $3,584.00 dated July 3, 2012. The funds were provided to the GFT by RB with a check in the amount of $4,000 dated July 2, 2012.

In the Debtor's SOFA filed with his original petition, the Debtor identified 2010 income:

| | |
|---|---|
| Core Advisory Services | $130,000 |
| RB | $72,144 |
| Walt Geer LLC | $4,052 |
| Total | $206,196 |

The Debtor's tax returns for the same period show:

| | |
|---|---|
| Core Advisory Services | $130,000 |
| RB | $1,472 |
| Walt Geer LLC (cabinet sales) | $4,052 |
| Walt Geer LLC (Hood Road) | $(3,395) |
| GFT (share of RB) | $72,144 |
| Total | $204,273 |

The net income from cabinet sales was ($4,703.00). Finally, the PictureU financial records for the same time period show that payments were made to the Debtor individually, and to RB in the amount of $206,182.

The Debtor's original SOFA shows that, in 2011, the Debtor received $268,556 from

RB which number was subsequently amended on November 1, 2012 to $223,960, the same amount shown on Debtor's tax return. This income consists of $49 from Walt Geer LLC, $197,876 from RB (including the GFT's portion), and $26,035 from wages and salaries ($25,000 of which was the Debtor's salary from RB and the balance was Ann's salary.) The PictureU records show $254,591 paid to RB. The RB draft tax return for 2011 shows gross receipts of $268,000 and ordinary income of $197,912. (Ex. 36). It is this ordinary income that is reflected on the Debtor's return.

The Debtor's original SOFA shows year-to-date income for 2012 of $90,000, but the SOFA amended on November 15, 2012 reflects year-to-date income of $190,880. PictureU's records show $190,880 paid to RB through September 2012.

The Debtor had numerous business ventures over the years, but not all of them were disclosed in his Schedules and SOFA. In answer to SOFA Question No. 18, which asks the Debtor to identify all businesses in which the Debtor was involved in any way during the prior six years, the Debtor identified RB, Walt Geer LLC, Core Advisory Services, and 16056 Inventory Management. The Debtor amended the SOFA on November 1, 2012 to include Phenix Global, Phenix Home, Phenix Direct and PictureU. The Debtor did not list eCompanyStore/Instawares Holding Company, LLC, eCabinetLiquidators.com, Enterprise Incentive Services, UPE, Enterprise Incentive Solutions or any others in response to this question. Enterprise Incentive Solutions is a company primarily owned by the Debtor's friend Jay Flowers. Mr. Flowers testified in his deposition played at trial he gave the Debtor a 1% interest in this company. The Debtor testified he was unaware of the interest and had received no K–1 or other documenta-

tion of the interest. UPE is identified on the Debtor's 2009 tax return, but the tax identification number is the same as Phenix Global and the 2009 return reflects no income from UPE. The Debtor testified he did not know what UPE was. At the 341 meeting, the Debtor and his counsel explained they thought they needed to disclose companies in which the Debtor held an interest within two years of the petition date, not six years.

In answer to question 13 on Schedule B, which asks the Debtor to identify interests in businesses, the Debtor only identified his interest in RB and Walt Geer LLC. His interests in any of the other entities (even at no value) were not identified. Finally, the Debtor did not initially schedule his 401(k) on Schedule B, but did amend it on November 1, 2012 to include the 401(k). At the 341 meeting it was clear his attorney mistakenly thought the Debtor's wife received the 401(k) in the divorce settlement.

During the trial, the Debtor was asked a number of questions and was the only live witness over a three-and-a-half day period.

### BASIS OF PLAINTIFF'S CLAIM

Plaintiff argues the Debtor testified falsely under oath on numerous occasions, specifically as follows:

(a) SOFA Question No. 1—the Debtor did not fully identify the sources or amounts of all income. Plaintiff contends the Debtor should have listed PictureU, Enterprise Incentive Services, UPE, and eCabinetLiquidators.com as additional sources of income. Plaintiff also alleges the Debtor did not fully disclose his 2011 income from Walt Geer LLC.

(b) SOFA Question Nos. 3a and b— Plaintiff asserts all transfers to Ann made by RB should have been disclosed as well as the payment to the

Debtor's father from the GFT reimbursing him for vacation expenses. Plaintiff insists RB was really the same as the Debtor, and all transfers from RB should have been identified in the SOFA.

(c) SOFA Question No. 5—Plaintiff maintains the foreclosure of the Hood Road Property should have been disclosed since it was foreclosed in November 2011, within one year of the filing of the petition.

(d) SOFA Question No. 7—Debtor took inconsistent positions as to whether the payments to his ex-wife were on account of the antecedent debt owed under the Divorce Decree. Potentially the transfers to Ann should have been listed in response to SOFA Question No. 7.

(e) SOFA Question No. 10a—Plaintiff claims the Debtor should have disclosed transfers related to the Hood Road Property, transfers to his ex-wife, transfers to his father for reimbursement of the vacation expenses, the transfer of $1,500 to the GFT, and transfers to his ex-wife related to the Divorce Decree.

(f) SOFA Question No. 10b—Plaintiff argues the Debtor should have identified the transfer of the Henderson Road Property to Ann and then into the QRPT and the transfer of funds into the GFT. It is Plaintiff's position that, notwithstanding that the Debtor is not the named beneficiary of either trust, he is the beneficiary in fact of each trust.

(g) SOFA Question No. 14—Plaintiff contends the Henderson Road Property should have been identified.

(h) SOFA Question No. 18—Plaintiff states the Debtor's interest in UPE, eCabinetLiquidators.com, eCompanyStore/Instawares Holding Company, LLC, Enterprise Incentive Services, and others should have been identified.

(i) Schedule A—Plaintiff alleges the Henderson Road Property should have been identified.

(j) Schedule B Question No. 12—the Debtor initially failed to disclose his 401(k) with Instawares Holding Company, LLC.

(k) Schedule B Question No. 13—Plaintiff claims the Debtor's ownership in the businesses identified above and others should have been listed.

(*l*) Schedule B Question No. 21—Plaintiff charges even the Debtor's amended Schedules were not completely truthful because they did not identify all the Options for the acquisition of the Henderson Road Property, including Option (4).

(m) Plaintiff avers the Debtor made a false oath when he signed the Declaration stating he had read the Schedules and SOFA.

(n) Plaintiff charges the Debtor testified falsely under oath at his 341 meeting, at court, and in his two depositions by testifying to the following:

(i) there was no capitalization of RB;

(ii) he did not know why his ex-wife paid the $20,000 back;

(iii) he did not know where the $45,000 to Ann had come from;

(iv) eCabinetLiquidators.com was not used;

(v) nothing more was done with Phenix Home after it was shut down notwithstanding the fact there were 19 checks written by the Debtor thereafter;

(vi) his agreement with PictureU was on an individual basis when it was with RB;

(vii) he and his wife bought the house "together";

(viii) there was nothing in the GFT as of the petition date, when there was $2,000 in its bank account;

(ix) he argued against making the payment of $29,000 to the GFT;

(x) he did not make any money on the sale of Phenix Home's inventory;

(xi) Precision Cabinets was not his tenant;

(xii) his liabilities did not exceed his assets in 2009; and

(xiii) he told PictureU to hire RB in 2009.

Plaintiff contends further that a number of the Debtor's transactions were undertaken or structured to hinder, delay or defraud creditors. Plaintiff challenges:

(a) the Debtor's transactions with Ann, both to exercise Option (4) under the Divorce Decree and to provide funds for the down payment on her house;

(b) the use of RB to receive and retain earnings from the Debtor's services;

(c) the transfers to the GFT;

(d) the transfer of the house to the QRPT;

(e) the conversion of a bonus from PictureU that should have been earned, to a loan; and

(f) the transfer of funds to his father to reimburse him for vacation expenses.

The transactions challenged by Plaintiff fall into several categories: first, RB; second, the GFT; third, the Henderson Road Property; fourth, transfers to Ann; fifth, the Hood Road Property; sixth, miscellaneous lack of disclosure in the SOFA and Schedules, including ownership of businesses, and the 401(k); and seventh, miscellaneous alleged false oaths in testimony. The Court will review each.

## LAW

 Plaintiff argues the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4). Because one of the fundamental goals of the Bankruptcy Code is to provide a debtor with a fresh start, "[a] denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." *Eastern Diversified Distribs., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 671 (Bankr.N.D.Ga.2004) (citations omitted). "The reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994) (citations omitted). The burden of proving the objection to discharge is on the plaintiff, Fed. R. Bankr. P. 4005, and the burden must be carried by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).[5]

---

5. Plaintiff, in his brief, suggests the burden of proof shifts to the Debtor after Plaintiff makes the *prima facie* case. Plaintiff cites the case of *In re Matus*, for that proposition. In turn, the *Matus* court cites *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984), and *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995). However, both *Chalik* and *Hawley* analyzed denial of discharge under 11 U.S.C. § 727(a)(5)

which prohibits a discharge if "the debtor has failed to explain satisfactorily ... any loss of assets". Under this prong of Section 727, the Code itself imposes some burden on the debtor to provide an explanation and thus the Court's analysis of burden shifting is consistent. The other cases relied upon by *Matus* similarly are either Section 727(a)(5) cases or simply lift the quote from *Chalik* and *Hawley* without discussion. The Advisory Committee

■ Section 727 of the Bankruptcy Code provides

(a) The court shall grant the debtor a discharge unless *(\*)*—

... (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). Thus, to deny a debtor a discharge under this section, Plaintiff must show the Debtor transferred its property, within the requisite time period, and had the requisite intent to hinder, delay or defraud. "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." *Collier on Bankruptcy* ¶ 727.02[1] (16th ed. Supp. 2013).

■ While "transfer" is not defined in Section 727, 11 U.S.C. § 101(54) defines transfer to mean,

(A) the creation of a lien;

(B) the retention of title as a security interest;

(C) the foreclosure of a debtor's equity of redemption; or

(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with—

(i) property; or

(ii) an interest in property.

Under this broad definition of transfer, even a disposition of possession, custody or control could qualify as a transfer. Removal, on the other hand, is "an actual or physical change in the position or locality of property of the debtor resulting in a depletion of the debtor's estate." *Collier on Bankruptcy* ¶ 727.02[6][a] (16th ed. Supp. 2010). Concealment includes physical hiding of the property, and "other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failing or refusing to disclose the information." *See San Jose v. McWilliams*, 284 F.3d 785, 794 (7th Cir. 2002); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 684 (6th Cir.2000); *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 n. 1 (10th Cir.1997).

■ The second requirement for denying a discharge under Section 727(a)(2) is that the property which is transferred, concealed or removed be property of the debtor or property of the estate. "[S]ection 727(a)(2)(A) does not apply when the disposition involves property belonging to someone, or some entity, other than the debtor, even if the transfer may cause an incidental effect upon the debtor's assets." *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 299 (Bankr.E.D.Pa. 2006). The debtor "must have more than a mere *derivative interest* in the property ... [it must have] a *direct* proprietary interest." *NE. Neb. Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472, 475 (8th Cir. BAP 2004). Third, the transfer must have been made by the debtor, as opposed to by another person or entity. Another requirement imposed by some

note on Fed. R. Bankr. P. 4005 explains that, although the rule imposes the initial burden of producing evidence and the ultimate burden of persuasion on the plaintiff, it leaves to the courts to formulate any rules governing the shifting of the burden of going forward with the evidence in light of the specific matters under consideration. Nevertheless, it is clear that the ultimate burden of persuasion and proof remains on Plaintiff.

courts is that the property which is transferred, concealed or removed have some value such that any assets available to creditors have been reduced. *See Syngenta Seeds, Inc. v. Wingate (In re Wingate),* 377 B.R. 687, 695 (Bankr.M.D.Fla.2006) (tenancy by entireties); *Bakst v. Levenson (In re Goldberg),* 229 B.R. 877, 883 (Bankr. S.D.Fla.1998) (exempt property).

Finally, a creditor proceeding under Section 727(a)(2) must prove the debtor possessed an actual intent to hinder, delay or defraud creditors or the trustee when he transferred, concealed or removed his or the estate's property. The Eleventh Circuit has made clear that a preferential transfer is not the type of transfer which will bar a discharge. *In re Miller,* 39 F.3d at 307. *See also Hultman v. Tevis,* 82 F.2d 940, 941 (9th Cir.1936); *Rutter v. Gen. Motors Acceptance Corp.,* 70 F.2d 479 (10th Cir.1934); *Ins. Office of America, Inc. v. Wall (In re Wall),* 2008 WL 8792259 (Bankr.S.D.Ga. Mar. 31, 2008). Constructive fraud is also insufficient. *In re Miller,* 39 F.3d at 306. Actual fraudulent intent, however, may be inferred from the circumstances surrounding the transfer or concealment. *Emmett Valley Assocs. v. Woodfield (In re Woodfield),* 978 F.2d 516, 518 (9th Cir.1992). The actions at issue should demonstrate "culpable intent", such that the actions are "blameworthy in an equitable sense." *Belmont Wine Exch., LLC v. Nascarella (In re Nascarella),* 492 B.R. 914, 916 (Bankr. M.D.Fla.2013) (citations omitted).

To deny a debtor a discharge under Section 727(a)(4), the plaintiff must show "... the debtor knowingly and fraudulently, in or in connection with the case— (a) made a false oath or account; ...". 11 U.S.C. § 727(a)(4). Under this section, the plaintiff must show there was a false oath, that it was material, and that it was made knowingly and fraudulently. A mis-representation is material if it bears a relationship to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property." *In re Chalik,* 748 F.2d at 618. Detriment to creditors need not be shown. *Id.* Furthermore, the debtor may not defend himself by claiming the assets omitted were worthless. *Id.* Creditors are entitled to judge for themselves what will benefit or prejudice them. *Id.* While the definition of materiality is broad, it is not without limits as the purpose of the requirement the debtor make disclosures is to allow the trustee or creditors to investigate the debtor's affairs and recover any assets without a "costly investigation". So if the omission would not assist or impede the debtor or creditors in this endeavor, it is not material. *Fogal Legware of Switz., Inc. v. Wills (In re Wills),* 243 B.R. 58, 63 (9th Cir. BAP 1999); *see also Cadle Co. v. Pratt (In re Pratt),* 411 F.3d 561, 568 (5th Cir.2005) (failure of debtor to list his position as trustee of trust for his children was not material because the knowledge would not assist the debtor's creditors); *Spencer v. Blanchard (In re Blanchard),* 201 B.R. 108, 130 (Bankr.E.D.Pa.1996) (undervaluing assets that would have been exempt was not material); *Manning v. Watkins (In re Watkins),* 474 B.R. 625, 655 (Bankr. N.D.Ind.2012); *aff'd sub nom; Manning v. Watkins,* 2013 WL 3989412 (N.D.Ind., July 21, 2013) (failure to disclose interest in corporations not material to administration of the estate); *Ivory v. Barbe (In re Barbe),* 466 B.R. 737, 748 (Bankr.W.D.Pa. 2012) (failure to disclose dismantled stage immaterial because had no value).

Finally, the plaintiff must show that the omission or misstatement was made knowingly and with intent to deceive. Again, the plaintiff must demonstrate actual common, not constructive,

fraud, *Wines v. Wines (In re Wines)*, 997 F.2d 852, 856 (11th Cir.1993), but actual intent may be inferred from circumstantial evidence. *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 123 (M.D.Fla. 1991). Furthermore, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727". *Cadle Co. v. Taras (In re Taras)*, 2005 WL 6487202, at *4 (Bankr.N.D.Ga. Aug. 19, 2005) (citation omitted). A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of intent to deceive. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). However, the discharge may not be denied when the untruth was the result of a mistake or inadvertence. *Id.* Further, while the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive. *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 565–66 (Bankr.S.D.Cal.1996).

### *RED BARCHETTA, LLC*

Plaintiff argues the Debtor used RB in a number of transactions which justify denial of his discharge. First, Plaintiff contends that the Debtor forming RB and conducting his consulting business through it, is a transfer or concealment of his income which justifies denial of discharge under Section 727(a)(2). Second, Plaintiff asserts the Debtor and RB are effectively the same so transfers from RB are essentially transfers from the Debtor. Plaintiff maintains some of the transfers from RB were made with intent to hinder, delay or defraud the Debtor's creditors and support a denial of discharge under Section 727(a)(2). Plaintiff further avers the Debtor should have identified all the transfers from RB in answer to SOFA Question Nos. 3 and 10, and that his failure to do so justifies denial of discharge under Section 727(a)(4).

Third, Plaintiff claims the Debtor lied under oath regarding the capitalization of RB.

The Debtor testified that RB was formed in 2010 after consultation with counsel as part of an overall estate plan. He was advised of tax advantages to operating as a consultant through a corporate entity as well as additional protections from liability. For those reasons, he followed the attorney's advice and formed RB.

The Stipulated Facts related to the Debtor's use of RB reveal the following: In 2010, the Debtor directed PictureU to make monthly consulting payments to RB rather than the Debtor individually. From October 2010 through the petition date, PictureU made payments for the Debtor's services (both salary and bonuses) to RB. From October 4, 2010 through December 31, 2010, PictureU wrote checks payable to RB totaling $76,182.25. In 2011, PictureU wrote checks or wire transferred $254,591.00 to RB. In 2012, PictureU wrote checks or wire transferred $226,733.92 to RB. The Debtor stipulated he did not take a salary from RB. Nevertheless, in the two years prior to the petition date, the Debtor wrote checks on RB's account to pay personal expenses, including writing himself checks from RB's accounts to pay his bills, used his RB debit card to pay for meals at restaurants and food at grocery stores, used his RB debit card to make cash withdrawals from ATM machines, wrote RB checks to pay personal tax obligations, wrote RB checks and used the RB debit card to pay for his daughters' school tuition and dance lessons, wrote RB checks to cover his obligations for alimony, the divorce settlement with Ann and his attorney's fees associated with the divorce, and used RB's debit card to pay for psychiatric services. (Stipulated Facts No. 56, 57, 63, 64). The checks

written on the RB account from September 2011 through September 2012 (one year pre-petition) total $262,938. (Ex. 20). Of this amount, over $175,000 was paid to the Debtor personally. Another $9,592 was written to Ann, and $33,090 was written to the GFT. Another $33,000 was paid to taxing authorities and approximately $4,800 was written to the Debtor's children's school and dance studio for expenses.

■■■ (a) *Creation and use of RB.* Plaintiff states first that the creation of RB and the Debtor's use of it to conduct business is a transfer or concealment of property of the Debtor with intent to hinder, delay or defraud a creditor or an officer of the estate. Plaintiff acknowledges that RB was created more than a year prior to the filing of the bankruptcy petition. Plaintiff argues though that the doctrine of continuing concealment permits the Court to find that a transfer or concealment made outside the one-year period is a continuing transfer or concealment within the one-year period if the Debtor continues the transfer or concealment within the one-year period. *See Behrman Chiropractic Clinics Inc. v. Johnson (In re Johnson),* 189 B.R. 985, 992 (Bankr. N.D.Ala.1995). The Court need not decide whether the doctrine applies in this case. The Court concludes RB was not created or operated with the intent to hinder, delay or defraud creditors, even if the creation of RB and the "transfer" of the Debtor's business operations to it or the "concealment" of the Debtor's income in it occurred "continuously" within the requisite time period.

The Debtor testified to the reasons why RB was set up more than two years[6] before the filing of the bankruptcy case. It is very common and usually recommended for individuals transacting business to do so through a corporate form. It is exceedingly common for professionals such as lawyers, doctors and accountants to operate in a corporate form, for exactly the reasons the Debtor testified his attorney advised him to establish a corporate form. The Debtor typically operated under a corporate name. Prior to 2010, the Debtor had been employed by Phenix Home, a corporate entity. Immediately after the failure of Phenix Home, the Debtor began some independent consulting, but always used a corporate name, even if it was only a DBA.

While Plaintiff suggested the corporate form was established because the Debtor was insolvent and wanted to delay the ability of creditors to garnish the Debtor's wages, there is simply no evidence of that intent. By early 2010, Plaintiff had purchased the loan from Georgian Bank and made demand on the Debtor. But no lawsuit was filed until June 19, 2012. (Stipulated Fact No. 90). By early 2010, Walt Geer LLC had defaulted on the loan to Power Lending, on which the Debtor was guarantor. But the Hood Road Property was not foreclosed until November 2011, so not until then did the Debtor know the amount, if any, of the shortfall he would be expected to pay. By early 2010, the Debtor was working with Advance Financial to liquidate its collateral. But there was no evidence Advance Financial had made demand on the Debtor or filed suit or otherwise tried to collect from him. In early 2010, the Debtor and Ann were married, not separated or divorced. So while the Debtor had contingent liabilities, and

---

**6.** While the Court is considering Plaintiff's argument assuming the continuous concealment doctrine applies and therefore transfers made more than one year before the petition date can be considered, the span of time between the creation of the entity and the filing of the bankruptcy remains relevant to determining the Debtor's intent in doing so.

based on certain assumptions about these liabilities the Debtor has acknowledged he was insolvent from August 2010 when RB was formed to the petition date, none of those creditors were suing, much less in any position to garnish wages. The Debtor's insolvency alone based on contingent liabilities not pressing at the time is not sufficient to show the Debtor established RB to hinder, delay or defraud creditors.

The Court finds further there was no evidence RB ever held any assets that could conceivably have been concealed from the Debtor's creditors. The Debtor clearly used RB's bank accounts to pay his personal expenses, but there was no evidence the funds were used to buy an asset or hide an asset or otherwise avoid paying creditors. Instead, the evidence showed the RB dollars went to the Debtor himself (which of course a creditor could then seize), went for the support of the Debtor's estranged wife and children, to pay taxes, and to pay other third-party creditors. The Court therefore concludes Plaintiff has not carried his burden of proving the Debtor intended to hinder, delay or defraud creditors by the creation and operation of RB. *See In re Nascarella,* 492 B.R. at 916–17 (noting "there is no dispute that the Debtor transferred money to pay his existing, legitimate creditors. The only difference here is that the Debtor transferred the money to his wife first before paying their creditors. The Court concludes that fact alone is not sufficient to" bar the Debtor's discharge.)

Plaintiff insists the Debtor concealed his income, and therefore property of the estate, by having payments made to RB rather than to the Debtor directly. In some cases, a debtor has been denied a discharge where his income is diverted to another person or entity on the theory that the income was concealed as described in Section 727(a)(2). *See Coady v. D.A.N.*

*Joint Venture III, L.P. (In re Coady),* 588 F.3d 1312 (11th Cir.2009); *U.S. Trustee v. Zhang (In re Zhang),* 463 B.R. 66 (Bankr. S.D.Ohio 2012). But here, the Debtor disclosed his personal income from RB from the very first filing of his SOFA and the majority of RB's funds were actually paid by RB to the Debtor and not "hidden" in RB. The amount of income reflected in the SOFA and the amount of income reflected in the Debtor's tax return are equivalent to the amounts shown by PictureU as paid to RB. The Court concludes the Debtor did not conceal property of the Debtor with intent to hinder, delay or defraud a creditor or an officer of the estate since the income was disclosed in his SOFA.

Plaintiff also alleges the Debtor concealed or transferred a bonus owed to him for pre-petition work at PictureU. The Debtor testified at his 341 meeting that RB's compensation from PictureU was $10,000 a month and then "at the end of the year it gets some type of bonus". (Ex. 1, pp. 45–46). The Debtor testified RB was anticipating a bonus being paid for 2012. In response to the question of how much that bonus would be, the Debtor stated, "Depending on the next several weeks, somewhere between $70,000 and $90,000." (Ex. 1, p. 46). In December 2012, after the 341 meeting, the Debtor reached an agreement with PictureU to be hired individually as the president of the company. At that time, the Debtor reached another agreement with PictureU whereby PictureU loaned the Debtor personally $100,000 rather than paying RB a bonus for 2012. If the Debtor remained employed with PictureU for two years (i.e., through December 2014), the loan would be forgiven. Plaintiff claims this "conversion" of the bonus to a forgivable loan is a transfer or concealment of income made

with intent to hinder, delay or defraud creditors.

The Court concludes Plaintiff is incorrect. First, the Court has already ruled that the Debtor's use of RB to transact business with PictureU and to receive income from PictureU was not a transfer or concealment made with intent to hinder, delay or defraud creditors. RB received 2010 and 2011 bonuses from PictureU and the Court sees nothing different in an expected 2012 bonus being paid to RB and not the Debtor. The Court concludes the anticipated payment of the bonus to RB was not a transfer or concealment made with intent to hinder, delay or defraud creditors.

Second, with respect to Plaintiff's allegations that the conversion of the bonus to a forgivable loan is a transfer or concealment with intent to hinder, delay or defraud creditors, Plaintiff has failed to prove a central element: that the property transferred or concealed was property of the Debtor before the date of the filing of the petition or property of the estate after the date of the filing of the petition. 11 U.S.C. § 727(a)(2). Prior to December 31, 2012, any bonus paid was property of RB and not property of the Debtor.

Third, even if RB was ignored as a separate entity and the expected bonus was treated as one of the Debtor, Plaintiff has not established the bonus was property of the Debtor as of the petition date or property of the estate. All the testimony with respect to the bonus was that it was a year-end bonus based on the company's performance for the year. While the Debtor had an expectation that RB would receive a bonus, there was no testimony that the Debtor or RB was entitled to receive the bonus on any prorated basis should the Debtor leave PictureU during the year. No evidence was presented to suggest any portion of the bonus was

earned as of the petition date such that conversion of that bonus to a forgivable loan would be a transfer or concealment of the Debtor's property. If the bonus was not earned by the Debtor as of the petition date, it was not property of the estate, the "conversion" of which post-petition was prohibited. Therefore, neither RB's anticipated receipt of the bonus nor the Debtor's and RB's "conversion" of any bonus to a forgivable loan forms a basis for denying the Debtor a discharge under Section 727(a)(2).

■ (b) *Transfers from RB as transfers of the Debtor.* Plaintiff's next argument is that all transfers from RB should be deemed to be transfers from the Debtor, and that such transfers were made to hinder, delay or defraud creditors. In effect, Plaintiff argues the Court should ignore the RB corporate form. Section 727(a)(2) specifies that the transfers at issue be of property of the debtor (pre-petition) or property of the estate (post-petition). The debtor "must have more than a mere *derivative interest* in the property in question because the term 'property of the debtor' as expressed in 11 U.S.C. § 727(a)(2)(A) has reference to property in which the debtor has a *direct* proprietary interest." *See In re Spitko,* 357 B.R. 272; *In re Wagner,* 305 B.R. at 475 (emphasis in original) (citations omitted).

When a corporation is a bona fide entity distinct from an individual debtor-shareholder, courts have applied the above-stated principle to hold that transfers of property belonging to the corporation are outside the scope of section 727(a)(2)(A).... Most courts considering whether a transfer of corporate property supports denial of discharge in an individual debtor's case have concluded it does not. Even though a debtor may have caused a corporation to fraud-

ulently transfer assets, that conduct does not support denial of discharge because the debtor has not transferred his own property.

*In re Spitko,* 357 B.R. at 299 (citing and quoting *In re Cassis,* 220 B.R. 979, 983–84 (Bankr.N.D.Iowa 1998)). The Debtor takes the position that RB is a separate entity, the property of RB is not the Debtor's property and transfers from it are not subject to a Section 727(a)(2) analysis.

 To justify disregarding a corporate entity like RB, the plaintiff must show the principals "disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exists." *Baillie Lumber Co. v. Thompson,* 279 Ga. 288, 289–90, 612 S.E.2d 296 (2005) (citations omitted). Courts typically look at whether the principals commingled the assets of the company with their personal assets or otherwise confused the assets, records and liabilities of the individual and the corporation. Piercing the corporate veil, or finding that a company is the alter ego of an individual, is justified where the owner treats the company and himself as one unit, *id.,* or where the owner uses corporate funds for personal expenses. *See Scott Bros., Inc. v. Warren,* 261 Ga.App. 285, 582 S.E.2d 224 (2003) (citations omitted).[7]

 RB is separately and validly incorporated, has a separate bank account and files a separate tax return. The Debtor did, however, use RB to pay personal expenses. This fact may justify piercing the corporate veil in the appropriate case. But "the concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility." *Renee Unlimited, Inc. v. Atlanta,* 301 Ga.App. 254, 259, 687 S.E.2d 233 (2009). In short, the alter ego and veil piercing doctrines under Georgia law are used as *remedies* for inequitable conduct which allow *corporate* creditors to pursue *individual* shareholders on *corporate* debts. It does not invalidate the corporate existence except for purposes of a particular creditor's debt collection.

 What Plaintiff seeks to do here is different from veil piercing. Plaintiff does not seek to make Debtor liable for RB's debts, but to make RB liable for Debtor's debts *and* to consolidate the two as if they are one so that RB's actions are viewed as those of the Debtor.[8] Because under *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the estate's interest in property is determined by state law, several bankruptcy courts have engaged in the reverse veil piercing analysis under Section 727 based on state law. *See In re Zhang,* 463 B.R. 66 (applying Ohio law); *Rodriguez v. Four Dominion Drive. LLC (In re Boyd),* 2012 WL 2014); *Acree v. McMahan,* 276 Ga. 880, 585 S.E.2d 873 (2003) (where the Supreme Court discusses reverse veil piercing and reverse alter-ego interchangeably.)

7. The Georgia courts refer to veil piercing and alter-ego interchangeably. The Eleventh Circuit in applying Georgia law described the theories as follows: "The corporate veil occasionally can be pierced by operation of the alter-ego doctrine ...". *Dearth v. Collins,* 441 F.3d 931, 934 (11th Cir.2006). *See also Atlantic Coast Cable, Inc. v. Mallory,* 246 Ga. App. 174, 175–76, 540 S.E.2d 206 (2000); *Howell v. U.S. Foods, Inc. (In re Bilbo),* 2014 WL 689097, at *8 (Bankr.N.D.Ga. Feb. 5,

8. This is different from an allegation that the debtor's property is being held by the corporation. This allegation is covered in part a) of this section.

5199141, 2012 Bankr.LEXIS 4968 (Bankr. W.D.Tex. Oct. 20, 2012) (applying Texas law); *Searcy v. Knight (In re Am. Int'l Refinery)*, 402 B.R. 728 (Bankr.W.D.La. 2008) (applying Nevada law); *Hovis v. United Screen Printers, Inc. (In re Elkay Industries, Inc.)*, 167 B.R. 404 (D.S.C. 1994) (concluding there is no South Carolina law on topic). A prohibited transfer under Section 727 must be a transfer of property of the debtor that otherwise would have been property of the estate under 11 U.S.C. § 541.

▇ In the foregoing cases, the bankruptcy courts found the applicable state law permitted the application of reverse veil piercing or reverse alter-ego theories, thus permitting the court to view transfers from the corporation as transfers from its sole shareholder. Under Georgia law, however, reverse veil piercing is not permitted. The Supreme Court of Georgia in *Acree v. McMahan* rejected "reverse piercing, at least to the extent that it would allow an 'outsider', such as a third-party creditor, to pierce the veil in order to reach a corporation's assets to satisfy claims against an individual corporate insider." 276 Ga. at 881, 585 S.E.2d 873. The court noted other remedies are available to creditors, and no new remedy is needed. *Id.* at 875. More recently, the Georgia Court of Appeals refused to find an exception to the Supreme Court's rejection of reverse piercing even in the case of a single shareholder corporation that is allegedly an alter-ego or fraud. *Holiday Hospitality Franchising, Inc. v. Noons*, 324 Ga.App. 70, 71, 749 S.E.2d 380 (2013).

An argument similar to Plaintiff's was considered by the Bankruptcy Court applying Georgia law in the case of *In re Bilbo*, 2014 WL 689097. There, the trustee contended that transfers made by the debtor's wholly-owned corporation were transfers of property of the debtor which could be recovered as preferences under 11 U.S.C. § 547. The bankruptcy court noted that reverse veil piercing is not permitted in Georgia, holding "because Georgia does not recognize a general theory of reverse veil piercing—and because this court should otherwise respect the corporation as an entity, distinct from the debtor—it appears that, assuming the truth of all facts asserted, there would be no cause of action linking the corporation's assets to the debtor under a theory of alter-ego or veil piercing." *Id.* at *6; *see also Gordon v. Harman (In re Harman)*, 512 B.R. 321 (Bankr.N.D.Ga.2014) (recognizing in 11 U.S.C. § 542 turnover action that reverse veil piercing is not permitted in Georgia with a possible exception if there is no adequate remedy at law); *Insituform Techs., LLC v. Cosmic TopHat, LLC*, 959 F.Supp.2d 1335 (N.D.Ga.2013) (reverse veil piercing not permitted in Georgia in context of patent liability case).

▇ Furthermore, the alter-ego and veil piercing doctrines are only remedies in Georgia and not independent causes of action. Kentucky, like Georgia, treats veil piercing as a remedy rather than a cause of action in its own right. The bankruptcy court in *Spradlin v. Beads & Steeds Inns, LLC (In re Howland)*, 516 B.R. 163 (Bankr.E.D.Ky.2014), recently explored Kentucky's approach to veil piercing and alter-ego in the context of a trustee's complaint under 11 U.S.C. § 548 to avoid a transfer made by a corporation as a transfer of the debtor. The court pointed out that what the trustee was looking for was not simply a remedy against the corporation but actually the assets and liabilities of the debtor and corporation both prospectively and retroactively. The court held "this logic is not consistent with veil piercing as a remedy in Kentucky". *Id.* at 169.

Even if the law supported Plaintiffs contention that the transfers from RB should be deemed to be the Debtor's transfers, for such transfers to be sufficient to bar the Debtor's discharge, the transfer must be made within the year prior to the petition date and with the purpose to hinder, delay or defraud a creditor or the trustee. *See* Section 727(a)(2). Reviewing the transfers made by RB within a year of the bankruptcy petition date, as evidenced by Exhibit Nos. 18 and 20, the transfers fall into several categories.

First, approximately $175,000 was transferred to the Debtor from RB. These transfers could not have been made to hinder, delay or defraud creditors as the money was actually transferred to the Debtor, thus his creditors had access to it. Second, RB transferred $33,000 to the IRS and the Georgia Department of Revenue within a year of the petition date for payment of the Debtor's taxes. This debt is valid. At most, this transfer is a preference, but not a transfer made to actually defraud creditors. RB also made payment on the Debtor's children's tuition and dance bills totaling $4,800. Again, these payments are at most preferences as there was no dispute about the Debtor's obligation on them.

RB transferred $33,090 to the GFT which is discussed in more detail in the GFT and Ann Geer sections below. One of the transfers, $4,000, was to reimburse the Debtor's father for vacation expenses of $3,584. No evidence was presented disputing the expenses were incurred, so the transfer would have been at most a preferential transfer and not a transfer made to hinder, delay or defraud creditors. Approximately $29,515 of the funds paid by RB to the GFT was transferred to Ann related to her purchase of a house, which the Court discusses in the Ann Geer section below, and concludes was not a trans-

fer to hinder, delay or defraud creditors. RB also transferred $9,592 directly to Ann within a year of the petition date. No evidence was presented that the transfers were made with intent to hinder, delay or defraud creditors. Instead, the Debtor testified that Ann needed the money and he still needed to support her and his children. One of the transfers is marked for insurance and another is marked as a settlement payment under the Divorce Decree. The transfers to Ann from RB were either ordinary course expenses or preferences, but not transfers to hinder, delay or defraud creditors.

Finally, approximately $48,762 was withdrawn by the Debtor from RB through check, debit, or on-line bill pay which is not covered in the discussion above. Virtually all are payments on ordinary expenses, either business expenses or the Debtor's personal expenses. The payments may be preferences, but none of the remaining withdrawals exceed $5,850. None of the remaining withdrawals evidence any acquisition of an asset or "parking" of funds in a non-debtor account which could support a finding of intent to hinder, delay or defraud. So, even if the Debtor and RB were one and the same, no basis exists to deny the Debtor a discharge. *In re Wall* 2008 WL 8792259; *In re Nascarella,* 492 B.R. 914.

█ (c) *Disclosure of transfers from RB.* Plaintiff contends the Debtor should be denied a discharge under 11 U.S.C. § 727(a)(4) because he made a false oath by not disclosing in response to SOFA Question Nos. 3 and 10 the transfers made by RB. SOFA Question No. 3a is inapplicable to this Debtor. SOFA Question No. 3b which is addressed to debtors like this one, whose debts are not primarily consumer debts, instructs the debtor to "list each payment or other transfer to any creditor made within 90 days immediately

preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,850." Finally, SOFA Question No. 3c asks all debtors to "list all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." SOFA Question No. 10 asks all debtors to list all property, other than property transferred in the ordinary course of business, which was transferred within two years preceding the case (whether on account of antecedent debt or not).

If RB and the Debtor are deemed to be one and the same such that RB's transfers must be identified, then some of the transfers identified above would have been included on the SOFA. For example, the transfers to the GFT and to Ann would have been identified as transfers to insiders. On the other hand, payments for the children's tuition or dance bills or for living expenses or on antecedent debt fall below the threshold in a non-consumer case and would not have been disclosed. The failure to identify transfers from RB is sufficient to block the Debtor's discharge only if the Court finds the Debtor failed to disclose them knowingly and fraudulently.

The Court cannot conclude the Debtor knowingly and fraudulently failed to identify RB's transfers to Ann or the GFT. First, the Court does not believe the end use of any of the transfers from RB was a fraudulent use by the Debtor or intended by the Debtor to be fraudulent. Moreover, the transfers were actually made by RB which is a separate company with a separate existence, a separate bank account, and a separate tax return.

Plaintiff asks the Court to require the Debtor to presume he was one and the same with RB, and therefore to list all of the transfers of RB on his SOFA. Given that the transfers made by RB were made from an RB account, that RB maintained separate bank accounts from the Debtor, that RB filed its own tax returns and that RB was a separate corporate entity, the Court simply cannot conclude that, with these elements of separateness, the Debtor's belief that RB was a separate entity and therefore the transfers from RB did not need to be identified was unreasonable. The Debtor stated at trial he did not see any question asking him to list transfers from third parties. "As much as those of us who have been involved in the administration of bankruptcy cases might wish otherwise, the Official Form Schedules and Statement of Financial Affairs are not as probingly inclusive as might be desired." *In re Watkins,* 474 B.R. at 644 (finding SOFA and schedules do not encompass the concept of "accounts from which the debtor drew money for personal purposes"). The Court concludes that any omission by the Debtor in disclosing transfers from RB as if they were his own transfers was not made knowingly and with intent to deceive.

(d) *Capitalization of RB.* Finally, Plaintiff argues the Debtor made a false oath when, at his 341 meeting, he testified that RB had not been capitalized. In fact, RB was capitalized with a $1,000 payment from GFT, which the Debtor had provided to GFT. The testimony of the Debtor regarding the capitalization of RB was false and is material since it involves the Debtor's assets. On the other hand, the transfer occurred more than two years before the filing of the bankruptcy petition, and was a relatively small amount. The Debtor's plausible explanation was that he simply forgot about the capitalization. The Court accepts the Debtor's testimony on this point, given the passage of time between the payment and the ques-

tion and the relatively small amount of it. The Court concludes the Debtor did not make the false statement knowingly and with intent to deceive.

## GEER FAMILY TRUST

The Debtor is the settlor of the GFT, an irrevocable grantor trust. (Ex. 75). The Debtor is not a beneficiary of the GFT; the beneficiaries are his spouse (for so long as she is his spouse), children, parents and siblings. The initial trustee of the GFT was the Debtor's brother, Will Geer (who became his bankruptcy attorney). However, in June 2011, the Debtor removed his brother as trustee and appointed his father as trustee of the GFT.

■ Plaintiff alleges numerous bases to deny the Debtor's discharge under Sections 727(a)(2) and (a)(4) in connection with the GFT. The Court agrees with Plaintiff's contention the Debtor's transfer of $1,500 to the GFT bank account on September 30, 2010 should have been disclosed in response to SOFA Question No. 10a. The transfer was within two years and its disclosure was a proper response to SOFA Question No. 10a. The Debtor testified he forgot about this transfer when answering SOFA Question No. 10a. Given that the transfer occurred almost two full years before the filing of the petition, that it was a relatively small amount, and that the Debtor did not deal with the bank accounts of GFT on a day-to-day basis, the Court believes the Debtor's explanation. The Court finds no evidence the Debtor omitted the $1,500 transfer from his SOFA knowingly and fraudulently.

Plaintiff argues next all transfers to the GFT, whether from RB or from the Debtor individually, should have been identified in answer to SOFA Question No. 10b. SOFA Question No. 10b only asks for transfers to self-settled trusts where the debtor is the beneficiary. Since the Debt-

or is not a beneficiary of the GFT, transfers to it from the Debtor need not have been included in the response.

■ Third, Plaintiff contends the Debtor lied under oath when the following occurred at the 341 meeting:

Q: And what is in the Geer Family 2010 Qualified Trust?

A. To my knowledge, nothing.

Plaintiff pointed out at the trial that there was approximately $2,000 contained in the GFT bank account as of the petition date. The Court finds Plaintiff has not established the Debtor made a false oath. First, the Debtor qualified his answer by saying "to my knowledge". There was no evidence presented the Debtor actually knew there was $2,000 in the GFT bank account at the time the petition was filed since he did not handle the GFT account on a daily basis nor receive the bank statements after December 2010. (Ex. 22, 23). To the extent the answer was false, the Court concludes it was not knowingly and fraudulently made. In effect, the GFT held nothing more than the original amount transferred into the trust, which the Debtor also forgot to list. Given the length of time since the initial transaction occurred and the fact the Debtor was not involved with the bank accounts of GFT, the Court accepts the Debtor's explanation of this testimony.

■ Next, Plaintiff maintains the establishment of the GFT, as well as the initial transfer of $1,500 to the trust, was acts taken with actual intent to hinder, delay or defraud creditors and therefore should bar the Debtor's discharge under Section 727(a)(2). As with the organization of RB and the establishment of the QRPT, the establishment of the GFT was part of the estate plan established by a non-bankruptcy attorney over two years before the filing of the bankruptcy peti-

tion. A family trust, such as the GFT, is a common tool used by estate planners to legitimately ease the transition of property upon the death of the grantor. Even though the Debtor may have been insolvent at the time the trust was created and the $1,500 was transferred, at most Plaintiff has stated a claim for avoidance of the $1,500 transferred to the GFT as a *constructively* fraudulent conveyance. Constructive fraudulent conveyances are not sufficient to deny a debtor's discharge because they do not involve intent to defraud, but a lack of reasonably equivalent value. Plaintiff has not proven the GFT was established or that the initial $1,500 was transferred to it with the Debtor having actual intent to hinder, delay or defraud creditors.

█ As with RB, Plaintiff claims the GFT was effectively the same as the Debtor and was part of an overall scheme to defraud creditors. Plaintiff reasons all transfers from the GFT should be treated as direct transfers from the Debtor even though Plaintiff has shown no basis for a determination the GFT was not validly established under Georgia law. Without deciding that the GFT and the Debtor are the same, the Court will analyze the transfers made by the GFT as if they were transfers of the Debtor.

First, on July 3, 2012, within 90 days of the filing of the bankruptcy petition, GFT transferred $3,584 to the Debtor's father, Walt Geer II, to reimburse him for expenses charged on his credit card by the Debtor when taking a vacation with his children. There is no dispute the Debtor took the vacation and incurred the expenses on his father's charge card. The transfer from the GFT, even if it were deemed to be from the Debtor, was at most a preferential payment to the Debtor's father on a valid expense. As discussed above, preferences are not the type of transfers that block a discharge because they do not involve moral turpitude. Such is the case here. Obviously, if the payment to the Debtor's father had been made directly by the Debtor, that transfer should have been listed in response to SOFA Question No. 3b. Given that the GFT exists and the transfer was not made directly by the Debtor, the Court concludes the Debtor did not omit listing the payment by the GFT to his father knowingly and fraudulently. The Debtor believed the GFT was a separate entity and that Question No. 3b did not ask for transfers from parties other than himself as he testified multiple times. *See In re Watkins,* 474 B.R. at 644.

The remaining three checks issued by the GFT pre-petition totaling $29,515 were all issued to or for the benefit of Ann. (Ex. 24). The source of the funds in each instance was RB. The use of the funds is related to the Debtor's separation and divorce from Ann. All of the transactions involving Ann are discussed in detail below.

### HENDERSON ROAD PROPERTY

█ On April 3, 2009, the Debtor purchased a home at 16056 Henderson Road, Alpharetta, Georgia. The Debtor testified at his 341 meeting that he and his wife bought the house "together". Plaintiff alleges the Debtor lied under oath when stating that he and his wife bought the house "together" since he originally took sole title to it. The Debtor explained at the trial that, to his understanding, he and his wife bought it together since they were married and the transfer occurred at the same closing as the acquisition. The Court believes the Debtor's use of the word "together" was meant as a common understanding, not a legal concept. The end result of the closing was that the Debtor and his wife—together, jointly—

owned the home. Even if this misstatement is material, the Court finds that it was not made knowingly and fraudulently and therefore does not bar the Debtor's discharge.

■ On March 24, 2010, the Debtor transferred his remaining interest in the house to Ann, who simultaneously conveyed the Henderson Road Property to the QRPT. As of the date of the filing of the bankruptcy petition, the QRPT continued to hold title to the house, and no evidence was presented that title had changed post-petition. When the Debtor and his wife separated, the Debtor moved from the house and was not residing there at the time the petition was filed. Post-petition, the Debtor moved back into the house where he continues to reside. The Debtor stipulated to the fact that he can live in the house for as long as he likes. The Debtor remains obligated on the note secured by the house and makes regular monthly mortgage payments in the amount of $2,308.33.

Plaintiff makes multiple claims regarding the transactions involving the QRPT. First, Plaintiff contends the transfer of the Henderson Road Property to the QRPT was made by the Debtor with the intent to hinder, delay or defraud his creditors. The transfer occurred in March 2010, more than one year prior to the filing of the bankruptcy petition as required by Section 727(a)(2). Plaintiff argues the doctrine of continuing concealment should apply such that the transfer is still subject to consideration under Section 727(a)(2).

Even if the Court were to apply the continuing concealment doctrine, the Court finds the transfer was not made with intent to hinder, delay or defraud creditors. The Debtor testified at the trial that the creation of the QRPT occurred at the same time as the formation of RB and the GFT. The Debtor testified that all three entities were created on the advice of non-bankruptcy counsel as part of an overall estate plan. The only evidence presented as to the terms of the trust were from the Debtor, stating that only the Debtor's spouse (for so long as she is the Debtor's spouse) and children are beneficiaries of the QRPT and that he is not a beneficiary of the trust. The Debtor is only the trustee of the QRPT. Moreover, the QRPT was listed as the owner of the Henderson Road Property on the Debtor's original Schedule F.

■ Plaintiff argues the Debtor was insolvent at the time the transfer was made. The Debtor admittedly had contingent obligations to RBC, Advance Financial and Plaintiff, and the Debtor admits his contingent liabilities exceeded his assets from August 2010 to the petition date. While insolvency of the Debtor is a factor in determining the Debtor's intent when transferring property, it is not determinative. The Debtor's insolvency could form a basis for recovery as a *constructively* fraudulent conveyance under Section 548(a)(1)(B) (transfer for less than reasonably equivalent value while the debtor is insolvent). A constructive fraudulent conveyance, though, is not sufficient to bar a discharge. *In re Wines*, 997 F.2d at 856. The transfer at issue occurred more than two years before the filing of the bankruptcy petition suggesting it was not part of bankruptcy planning, the Debtor is not a beneficiary of the QRPT, and the Debtor had a valid reason for transferring the property to the QRPT. Even if the Debtor was insolvent, Plaintiff has not carried his burden of proving the Debtor transferred the Henderson Road Property with intent to hinder, delay or defraud creditors.

Next, Plaintiff asserts the transfer of the Henderson Road Property to the QRPT should have been disclosed in re-

sponse to SOFA Question Nos. 10a and 10b. Even if the Court were to consider the actual two-step transfer of the Henderson Road Property from the Debtor to his wife and his wife to the QRPT as only one transfer, the transfer need not be reported in response to SOFA Question Nos. 10a and 10b. The transfer occurred more than two years before the filing of the bankruptcy petition and therefore is not responsive to Question No. 10a. Because the Debtor is not a beneficiary of the QRPT, the transfer of the Henderson Road Property to the QRPT need not be disclosed in response to Question No. 10b.

Plaintiff insists that, even if the Debtor is not the technical beneficiary of the house, because he lives in the house now, he is benefitting from the house and from the QRPT. The term "beneficiary" as used in SOFA Question No. 10b is not as broad as Plaintiff argues. The term is used in its legal sense as a beneficiary of the trust. Even if the question could be construed more broadly, it is certainly logical for a debtor and counsel to understand the question as asking for legal beneficiaries. The Court concludes any failure of the Debtor to disclose the benefit he may receive from living in the house in response to Question No. 10b was not knowing and fraudulent, given the phrasing of the question. The Court notes the Debtor disclosed the existence of the QRPT in Schedule F where he listed Wells Fargo Home Mortgage as a creditor secured by real property located at 16056 Henderson Road, Alpharetta, Georgia, owned by the QRPT. This is further evidence that any omission by the Debtor in disclosing the transfer to the QRPT in response to Question No. 10b was not with fraudulent intent.

Plaintiff maintains further the Debtor should have listed the Henderson Road Property on Schedule A. Schedule A only asks for the Debtor's interest in real property. It specifically asks for "any property in which the debtor holds rights and powers exercisable for the debtor's own benefit." The only evidence presented is that the Debtor's wife and children were the sole beneficiaries of the QRPT, so the Henderson Road Property did not need to be disclosed on Schedule A. The Court notes the Debtor should have identified the Henderson Road Property in answer to SOFA Question No. 14. This question asks the Debtor to list all property owned by another person that the Debtor holds or controls. Since the Henderson Road Property was owned by the QRPT, of which the Debtor was the trustee, it should have been disclosed in response to this question. Nevertheless, the Court concludes the Debtor's failure to disclose the QRPT in answer to SOFA Question No. 14 was not knowing and fraudulent as evidenced by the fact the Debtor disclosed the QRPT in Schedule F and was not attempting to hide the information.

### *TRANSACTIONS WITH ANN GEER*

Plaintiff raises numerous objections to the Debtor's transactions with his now ex-wife Ann. Plaintiff contends the Debtor made false oaths in failing to disclose various transfers to and agreements with Ann made in connection with the divorce and in connection with her purchase of a new house. He also submits the transfers to Ann were made by the Debtor with intent to hinder, delay or defraud creditors. These objections generally fall into the categories of property division under the Divorce Decree (other than with respect to the Henderson Road Property), Options related to the Henderson Road Property, and transfers to Ann for the acquisition of a new house. Details regarding the Debtor's transactions with Ann are set out above in the Fact section.

■ (a) *Divorce Decree.* SOFA Question No. 10a asks the debtor to "list all other property, ... transferred either absolutely or as security within two years immediately preceding the commencement of the case." SOFA Question No. 3 asks the Debtor to identify transfers made to an insider on account of antecedent debt within one year. The Debtor answered the questions "none" when the Schedules were filed. Nevertheless, the Divorce Decree dated February 9, 2012 between the Debtor and Ann, includes traditional property division provisions and obligations of the Debtor. (Ex. 87). None of the transfers made pursuant to the Divorce Decree were identified in the initial response to SOFA Question Nos. 10a or 3. SOFA Question No. 10a was amended on March 6, 2013 to show that household furniture, goods and IRAs were transferred to Ann pursuant to the Divorce Decree. No disclosures were ever made with regard to any funds transferred to Ann, either as division of joint bank accounts or in payment of the Debtor's obligations under the Divorce Decree.

No evidence was presented at the trial, however, that any money in joint bank accounts was divided or that the Debtor (as opposed to RB) transferred any funds to Ann pursuant to the Divorce Decree or otherwise. The transfers made by RB to Ann are discussed above in connection with the Court's analysis of RB and are at most preferences, and not transfers made with· fraudulent intent. The Debtor's property division with his ex-wife should have been disclosed in response to SOFA Question No. 10a and the payments to Ann pursuant to the Divorce Decree should have been disclosed in response to SOFA Question No. 3 if RB and the Debtor are deemed the same. But the Court concludes no evidence was presented that the Debtor's failure to disclose the property division or payments under the Divorce Decree was knowing and deceptive. The Debtor readily discussed the transfer of the IRAs at the 341 meeting and ultimately amended his Schedules to identify the property division under the Divorce Decree. The Debtor's position that transfers from RB are not responsive to the SOFA has been discussed above. As such, the Court finds this allegation is insufficient to deny the Debtor a discharge under Section 727.

■ (b) *Options on Henderson Road Property.* Plaintiff argues that the Options provided to the Debtor under the Divorce Decree with respect to the Henderson Road Property should have been disclosed. Schedule B, Question No. 21 asks the debtor to identify "other contingent and unliquidated claims of every nature ...". This is asking the debtor to identify contingent *assets,* which the trustee may eventually be able to recover and liquidate. Reviewing the Options identified in the Divorce Decree, the Court does not believe any of the Options needed to be scheduled other than Option (3), which was disclosed in the Debtor's March 2013 amendment. A review of the Options provided the Debtor under the Divorce Decree will explain this conclusion.

Option (1) under the Divorce Decree permitted the Debtor to refinance the mortgage on the house and pay his ex-wife $50,000. This Option provided the Debtor no contingent interest or asset. The Debtor was already solely liable on the mortgage on this house and Option (1) simply provided a mechanism for obtaining the $50,000 which he agreed to pay to Ann. Option (2) allowed the Debtor to obtain two appraisals of the house, average the values and in accordance with the formula set forth in the Divorce Decree pay his ex-wife the greater of $50,000 or the equity in the house. Again, nothing about Option

(2) provided a contingent asset to the Debtor but simply a mechanism for satisfying his obligation. Option (3) under the Divorce Decree allowed the house to be sold and the Debtor's ex-wife to receive 100% of the sales proceeds up to the sum of $50,000. Any sales proceeds in excess of $50,000 were to be held by the Debtor and applied toward his children's college education expenses. Option (3) should have been disclosed in response to Schedule B, Question No. 21. If Option (3) were exercised, the Debtor personally would have received any proceeds in excess of $50,000, even though the use of the funds was restricted. Although Option (3) should have been disclosed, was not initially disclosed, and was material, the Court finds the Debtor's failure to disclose it was not knowing and with intent to deceive. Given that the house is titled in the name of the QRPT, which has been discussed above, and that there were restrictions on the Debtor's use of the funds he might receive from the sale of the house (which restrictions were consistent with the QRPT), it is understandable the Debtor and his counsel may not have viewed the funds as belonging to the Debtor.

On October 3, 2012, only a month after the petition was filed, the Debtor and Ann amended the final judgment of divorce to provide an Option (4) with respect to the Henderson Road Property. (Ex. 89). Under Option (4), the Debtor could pay Ann $45,000 for her interest in the house. The Court concludes Option (4) need not have been disclosed in Schedule B, Question No. 21. First, on its face, Option (4) became available after the petition was filed, while the Schedules are meant to reflect the status of the debtor's assets as of the petition date. Second, nothing in Option (4) resulted in the Debtor personally receiving any funds or assets; rather, the QRPT retained title to the house. Plaintiff's argument, of course, is that the QRPT is not valid and the Debtor should be presumed to be the owner of the house. This allegation has been discussed and rejected above. Plaintiff also claims the Debtor received a contingent benefit from Option (4) because he can live in the house. Although living in the house is certainly of benefit to the Debtor, this is not the type of contingent claim to be disclosed in response to Schedule B, Question No. 21. It is not an asset that can be liquidated for creditors. The Court therefore concludes the Debtor's "failure" to disclose the Options with respect to the Henderson Road Property as set out in the Divorce Decree are not sufficient to deny the Debtor a discharge under Section 727.

(c) *Acquisition of house.* Lastly, Plaintiff charges the transfers made to Ann for the acquisition of a new house were transfers made with intent to hinder, delay or defraud creditors and should have been identified in response to SOFA Question Nos. 10 (Transfers), 3b (Payments to Creditors), and/or 7 (Gifts). Plaintiff also asserts the Debtor gave false testimony with respect to the transfers made to Ann to enable her to acquire a house.

The specific transfers to Ann are described above in the Fact section. In the summer of 2012, after the Divorce Decree was finalized, Ann asked the Debtor for money to buy another house. PvB wrote three checks to GFT from July 30, 2012 through September 12, 2012 which enabled GFT to pay to Ann, or on her behalf, $29,515. ($7,203 was transferred on Ann's behalf directly to the builder/developer.) There is no doubt in the Court's mind that Ann initiated those transactions, and not the Debtor. Her desire for a new house had nothing to do with the Debtor, but rather with moving forward with her post-divorce life. It is also clear to the Court

that the timing of Ann's requests for funds could not have been worse from the Debtor's perspective, given his imminent bankruptcy filing. Nevertheless, the Debtor attempted to facilitate the transfer of money to Ann to enable her and the children to acquire the new house.

The Debtor pointed out in his testimony that none of the transfers were made directly from him. All of the transfers to Ann were made by the GFT, and the transfers to the GFT were made by RB. As the Court has discussed above in connection with RB and the GFT, the Debtor's omission of such transfers from SOFA Question Nos. 10, 3b and 7 is excusable. The Court has found no evidence the Debtor's failure to list the transfers in response to the SOFA questions was made with intent to defraud. As the Debtor testified repeatedly, there is no place on the Schedules asking for transfers from third parties as opposed to transfers from the debtor himself. Although a trustee may ultimately be successful in consolidating the Debtor's assets with those of RB and the GFT for purposes of any equitable remedy, the Court is not prepared to say a debtor must presume at the time it completes its Schedules that the remedy will be invoked.

■ The Court also finds the transfers of funds to Ann for the purpose of acquiring her new home were not made with intent to hinder, delay or defraud creditors. Again, the Debtor maintains the transfers were not transfers of property of the Debtor, which is the first element in establishing the requirements of Section 727(a)(2)(A). The transfers were made by RB to the GFT which paid the funds to or for Ann. But even if the transfers were of property of the Debtor, the Court concludes the transfers were not made with intent to hinder, delay or defraud creditors. The transfers were made with the intent to assist the Debtor's ex-wife and

children in the acquisition of a home. There is no allegation and no evidence the Debtor retained or obtained any interest or benefit in the new home. Plaintiff's only allegation is that, by facilitating the transfer of funds, the Debtor accomplished two goals: (i) a satisfaction of his obligation to Ann under the Divorce Decree, and (ii) the removal of any interest she may have in the Henderson Road Property.

To the extent the transfers were made to satisfy the Debtor's obligations under the Divorce Decree or resulted in such satisfaction, the transfers were at most a preference on a debt that is non-dischargeable (11 U.S.C. §§ 523(a)(5) and (a)(15)) and may also have been a priority claim under 11 U.S.C. § 507(a)(1). But a preferential transfer is not the type of transfer to bar a discharge under Section 727(a)(2). To the extent the transfers facilitated a satisfaction of Ann's interest in the Henderson Road Property, no fraudulent intent has been established. The Debtor had an obligation under the Divorce Decree to pay Ann up to $50,000 for her interest in the house. The Debtor did not obtain or retain any interest in the Henderson Road Property to which he was not entitled under the Divorce Decree.

Because Plaintiff's entire case is based on the assumption that the QRPT, RB and GFT are all the same as the Debtor, Plaintiff assumes that once Ann's interest in the house is satisfied, the Debtor's interest in the house increases. Nevertheless, there is no basis to ignore the title to the house being held by the QRPT. The removal of Ann's interest in the house does not benefit the Debtor, but rather the couple's children as the beneficiaries of the QRPT. Moreover, the Debtor testified freely at the 341 meeting regarding the title to the house; the QRPT holding title was disclosed in the Debtor's Schedules; and the

Debtor testified at the 341 meeting his belief that the value of the property was not greater than the amount of the debt on the house, on which the Debtor was obligated. The lack of evidence of any value in the house for creditors is further support for the Court's conclusion that the intent behind the transfer of funds to enable Ann to purchase a new home, whether in satisfaction of the Divorce Decree, or a loan, or a gift, was not to hinder, delay or defraud creditors.

Unfortunately for the Debtor, the attempts by the Debtor to document the transfers, apparently on advice of others whom he did not name, made the transaction appear suspicious to Plaintiff. The Debtor, his brother, his father, and perhaps Jay Flowers, put some thought into how best to structure the payment of funds to Ann. E-mails were introduced into evidence that initially said the trust would provide money to Ann to help her get a contract on a house. Then, the Debtor asked his father as the GFT trustee to authorize the Debtor to pay himself a distribution of $20,000 from RB, which he would use to pay Ann on his divorce obligations. Then, he changed his mind less than two hours later and asked his father, the GFT trustee, to direct that the $20,000 be paid to the GFT as a distribution. The evidence also shows the Debtor initially intended the payments to reduce his obligations under the Divorce Decree. (Ex. 68). Although the Debtor did not explain why he changed his mind and asked his friend Jay Flowers to make a loan to the GFT to complete the Debtor's obligations under the Divorce Decree, the Court's clear impression is the Debtor received advice that the direct payment under the Divorce Decree could potentially be a preference.

■ In short, the Debtor and his "advisors" documented and re-documented, characterized and re-characterized the transaction in ways the Debtor testified were the "right way" they thought. Although the descriptions of the transactions with Ann may have been meant to provide her with defenses to any potential lawsuit by a trustee, the Court concludes that Section 727(a)(2) is aimed at the substance of the transaction and not merely its description. Plaintiff has argued repeatedly the Court must look to the substance of the transactions involving the Debtor, RB and the GFT and should not be bound by the Debtor's description of various transactions. In looking at the substance of this transaction with Ann, the Court is convinced the transaction was not carried out with any intent to hinder, delay or defraud creditors despite the inconsistent, uneducated and sloppy way in which the transaction was documented.

Finally, Plaintiff insists the Debtor lied under oath in his testimony (i) regarding the source of the funds for the GFT to pay Ann $45,000 to satisfy the Debtor's obligations under the Divorce Decree; (ii) that the Debtor argued against the payment of the $29,000 to Ann; and (iii) as to why the $20,000 was paid back by Ann to the GFT. The Court will review each of these arguments.

■ (i) *Source of $45,000.* Plaintiff avers the Debtor testified falsely when he stated he did not know where the money had come from to pay Ann $45,000 to exercise Option (4). Plaintiff pointed to the Debtor's 2004 examination taken on March 7, 2013. (Ex. 2, pp. 13–15). The Debtor and Plaintiff's counsel had the following exchange:

Q: How much was she paid for her interest in the house?

A: I believe $45,000.

Q: And who paid her the $45,000?

A: The 2010 Geer Family Trust.

Q: Where did the Geer 2010 Family Trust get that money?

A: I don't control that trust, so I'm not entirely sure.

At the trial, Plaintiff stopped the replay of the deposition at this answer. Had Plaintiff continued with the following questions and answers from the Debtor, Plaintiff would see that the Debtor did not make a false oath. The following exchange occurred:

Q: What is your understanding of where the trust got that money?

A: I believe a gentleman loaned the trust the money to do that.

Q: And who was that gentleman?

A: Jay Flowers.

Q: How much did Mr. Flowers loan the 2010 Geer Family Trust?

A: Somewhere around $35,000.

Q: How was it that Mr. Flowers loaned the Geer Family Trust $35,000?

. . .

Q: Sir, did you have any part in Mr. Flowers making a loan to the Geer Family Trust? . . . Did you speak to Mr. Flowers about making the loan?

A: Yes.

Q: Did you ask Mr. Flowers to make the loan?

A: Did I ask Mr. Flowers? I don't recall if I asked him or if my father or my ex-wife asked him.

When the entire exchange is reviewed, it is clear the Debtor did not make a false oath at his 2004 examination. He did not volunteer the information as readily as Plaintiff's counsel or the Court would like, and his initial response was evasive. But he did not lie.

Plaintiff next argues the Debtor testified at this same 2004 examination that the $45,000 was paid in December 2012 when in fact, a portion of the funds paid pre-petition to Ann were eventually credited to the $45,000 payment. (Ex. 2, pp. 13, 152). Plaintiff argues these answers were incorrect because the Debtor did not volunteer at the time that the $45,000 payment consisted in part of $9,500 paid pre-petition. Nevertheless, the Debtor disclosed the payments made pre-petition in the same deposition. (Ex. 2, pp. 164–165). The Debtor explained these earlier payments made to Ann were not a credit on the amount that was owed under the Divorce Decree as the transaction was originally structured. The Debtor testified consistently in the deposition and at trial that, as matters evolved, some of the payments that were made pre-petition ($9,500) were credited to the Debtor's exercise of Option (4) (which did not even exist when the earlier payments were made). Taking the Debtor's testimony as a whole, as opposed to considering a question and answer out of context, the Debtor did not make a false oath with respect to the source of the $45,000 paid to Ann for the exercise of Option (4).

 (ii) *Argument on payment of $29,000.* The Debtor testified at the trial he argued against the payment of funds from RB to the GFT to Ann. Plaintiff pointed out the e-mail chain between the Debtor and his father where the Debtor instructed his father to ask RB for the funds to be delivered to the GFT and then to Ann. While those two pieces of evidence appear inconsistent, reviewing the Debtor's entire testimony in his depositions allows the Court to see the full view and conclude the Debtor did not lie under oath. In the Debtor's March 7, 2013 deposition, the Debtor and Plaintiff's counsel had the following exchange:

A: I did not want to make the distributions.

Q: And did you tell him why you didn't want to make the distributions?

A: I did.

Q: What did you tell him?

A: I told him I had obligations to Ann, I had obligations to the IRS, I would rather kept the money in there, file the bankruptcy, leave it all there.

. . .

Q: Was this one of the checks that you didn't want to write but your father made you write?

A: The one I recall was the $20,000.

. . .

Q: Is the check you didn't want to make but your father made you write?

A: 3127 is a check that I felt at the time should not have been written.

Q: And why was that?

A: Why did I think it shouldn't be written? Because I owed the IRS all the money, I was concerned I would not have it to pay the IRS, and I just didn't want to do it. And he felt . . . you know, it is what it is.

(Ex. 2, pp. 226, 228). The Debtor testified similarly in his deposition on September 11, 2013.

Q: So the $20,000 payment was for the house?

A: I don't know, David. She needed money. I told her I—I didn't do it. I didn't feel comfortable doing it. I didn't want to—I mean, you're right, in hindsight I could have. It would have been a perfectly legal thing for me to have done. I could have done it. She talked to my father. I actually talked to him, debated with him. I thought if we do anything, let's go pay the IRS.

(Ex. 4, p. 158). When the Debtor's statement that he argued with his father is taken in the context of his full testimony, it is clear to the Court that what he debated with his father was the original decision about whether to pay money to Ann as opposed to paying the IRS or simply holding it in the RB account. The Debtor did not dispute that once the decision to make payments to Ann was made, he was part of facilitating and directing the payment of the money to Ann. The Debtor testified repeatedly at his 341 meeting and at two depositions that he directed the payment of the money to Ann and he did know where the money went. So the Court concludes the Debtor did not make a false oath when he stated he argued with his father on the payment of $29,000 to Ann.

[redacted] (iii) *Repayment of $20,000.* Plaintiff next argues the Debtor testified falsely at the trial before this Court when he stated more than once that he did not know why Ann paid the $20,000 back to the GFT. "She just did; her deal was with my Father." Nevertheless, Ann testified in her deposition, which was replayed at the trial as follows:

Q: Did someone ask you to pay the $20,000 back?

A: Yeah.

Q: Who asked you to pay that back?

A: I think Walt did.

. . .

Q: But in any event, Mr. Geer asked you to pay back the 20,000 and you paid back the 20,000?

A: Yes.

The Debtor was not redirected on this point by his counsel, and offered no explanation for the apparent inconsistency in the testimony.

It is unclear the Debtor's statement that he does not know why Ann repaid the money was inaccurate. The question

asked of the Debtor was "why" Ann repaid the $20,000. The Debtor's answer of "I don't know" could be construed as "I don't remember", as "I don't know" *why* it was advisable for her to pay it back or as I don't know how she came to decide to pay it back—if she thought of it or I asked for it. The question asked of Ann was, "Did someone ask you to pay the $20,000 back?", which is a different question. Ann's initial answer was she "thought" the Debtor asked her to do it. Her response was less than certain, although when she was re-asked in a leading question format to confirm the Debtor asked her pay it back, she said, "Yes". Given the ambiguity in the question and Ann's response, the Court concludes Plaintiff has not established by a preponderance of the evidence the Debtor made a false oath.

But assuming the Debtor answered evasively and untruthfully, the question is whether the statement, "I don't know", is material and made with intent to deceive. The Debtor's answer is not deceptive as to the substance of the transaction to which the Debtor testified truthfully at his 341 meeting and other instances. The Debtor did not make a false statement as to the fact of the transaction or affirmatively mislead the Court as to the reason for the transaction. The question and answer were ambiguous at best, and the "I don't know" response is not material, so the Court does not deem this statement to be sufficient to deny the Debtor a discharge.

## *HOOD ROAD PROPERTY*

■ Plaintiff asserts the Hood Road Property was in the Debtor's name, not in the name of Walt Geer LLC, and the Debtor should have disclosed transfers relating to the Hood Road Property and the foreclosure of the Hood Road Property in response to SOFA Question No. 5. Plaintiff also suggests the Debtor received money from the operation of the Hood Road Property that should have been disclosed.

The Debtor testified believably that he thought the property was in the name of Walt Geer LLC. It is clear to the Court that, regardless of what the Debtor thought, the property was held by Walt Geer individually. It is also undisputed, though, that the property was foreclosed by RBC Bank on November 1, 2011, and therefore was not property of the Debtor's to be identified in the Schedules. At most, the Debtor should have reflected the foreclosure in answer to SOFA Question No. 5. The Court concludes the Debtor's failure to disclose the foreclosure in answer to Question No. 5 is not material given that the property was foreclosed almost a year prior to the bankruptcy filing by a third-party creditor. The Court also concludes that any failure to disclose the foreclosure of the Hood Road Property was not knowing or fraudulent. The Debtor identified RBC as a creditor on his initial Schedule F and showed the deficiency resulting from the foreclosure.

The Court further concludes there were no other transfers related to the Hood Road Property that should have been disclosed in the SOFA. Plaintiff is concerned with a series of transactions reflected in Exhibit 116 involving Energy Way Corporation. The exhibit reflects, and the Debtor believably testified, that the Hood Road Property was sold at a tax sale by Pickens County to Energy Way Corporation. It was the Debtor's understanding, and Exhibit 116 reflects, that Power Lending then exercised its right of redemption as the secured lien holder and obtained a reconveyance of the property. No evidence was presented that the Debtor ever received any money from any of the transactions or in any way instigated any of the transfers between Energy Way and Power Lending, or between Power Lending and RBC.

*MISCELLANEOUS SCHEDULE*
*AND SOFA OMISSIONS*

Plaintiff avers the Debtor made numerous omissions and false statements in his Schedules and SOFA which constitute false oaths under 11 U.S.C. § 727(a)(4) and bar the Debtor's discharge. To prevail on this claim, Plaintiff must show there was a false oath, that it was material, and that it was made knowingly and fraudulently.

 (a) *Income*. Plaintiff claims the Debtor's response to SOFA Question No. 1 in the original SOFA and as amended is false. Question No. 1 asks the debtor to "state the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced [and for] the two years immediately preceding this calendar year." The Debtor's response to this question in the SOFA filed September 25, 2012 is as follows:

| | | |
|---|---|---|
| 2010 | Core Advisory Services | $130,000 |
| | RB | $72,144 |
| | Walt Geer LLC | $4,052 |
| 2011 | RB | $268,556 |
| YTD | RB | $90,000 |

On November 1, 2012, the Debtor amended his response to show as follows:

| | | |
|---|---|---|
| 2010 | Core Advisory Services | $130,000 |
| | RB | $72,144 |
| | Walt Geer LLC | $4,052 |
| 2011 | RB | $223,960 |
| YTD | RB | $90,0000 |

In the Debtor's amendment on November 15, 2012, the Debtor revised his response again:

| | | |
|---|---|---|
| 2010 | Core Advisory Services | $130,000 |
| | RB | $72,144 |
| | Walt Geer, LLC | $4,052 |
| 2011 | RB | $223,960 |
| YTD | RB | $190,880 |

The Debtor made no changes to the answer to Question No. 1 in the amendment filed on March 6, 2013.

Reviewing all three responses, the Debtor made no changes to his disclosure of 2010 income, but did make changes to 2011 and year-to-date 2012 income. Plaintiff argues the income is understated and the source of the income is not accurately reflected. In particular, Plaintiff charges

the Debtor worked for PictureU in 2010–2012, and PictureU should be identified as the source of the Debtor's income rather than Core Advisory Services or RB. Plaintiff also asserts the Debtor did business as Enterprise Incentive Services and no income from that entity is disclosed.

As discussed in the Findings of Fact, the Debtor's 2010 total income of $206,196 as disclosed in his SOFA compares favorably to the Debtor's 2010 tax return which shows total income of $204,273 and to the PictureU financial records which reflect payments made to the Debtor individually and to RB in the amount of $206,182. While the numbers do not match exactly, the amount disclosed in the SOFA exceeds the amount in the tax return and in PictureU's records, so the Court concludes the Debtor did not understate his 2010 income.

The next question is whether the Debtor lied about the source of his 2010 income. The fact the Debtor's tax return indicates income from the GFT does not suggest to the Court the Debtor made a false oath even though the GFT is not shown as a source of income in the SOFA. As a grantor trust, the GFT's income is reflected on the Debtor's individual tax return. The GFT's income on the Debtor's tax return is its share of RB's income which is disclosed in the Debtor's SOFA as income from RB. PictureU is not listed on the SOFA as a source of income. The PictureU records show the Debtor individually received consulting fees from PictureU from January 2010 through September 2010. (Ex. 47). The Debtor testified that, when he worked as a consultant to PictureU, he used the name Core Advisory Services as his DBA. While the Debtor could have identified PictureU as the source of a portion of his income in 2010, it was also accurate to say the source of the income was Core Advisory Services since that was the Debtor's DBA and how the

income was listed on his tax return. The response to SOFA Question No. 1 does not include income from Walt Geer LLC as to the Hood Road Property. The Debtor's 2010 return shows ($3,395) from Walt Geer LLC from the Hood Road Property. Since the income was negative from the Hood Road Property, any failure to disclose it is not material. While the information regarding the source of the Debtor's 2010 income is not entirely correct, it is substantially correct and the Court concludes that any false information was not material and not provided knowingly and fraudulently.

The Debtor's original SOFA shows that in 2011 the Debtor received $268,556 from RB. This number was subsequently amended on November 1, 2012 to $223,960, which is the same amount shown on the Debtor's 2011 tax return as total income from all sources: $49 from Walt Geer LLC, $197,876 from RB (including the GFT's portion) and $26,035 in wages and salaries (including $25,000 from RB). The PictureU records for the same time period show $254,591 paid to RB. A review of the RB draft tax return for 2011 shows gross receipts of $268,556 and ordinary income of $197,912. (Ex. 36). RB's ordinary income is reflected in the Debtor's 2011 tax return as a component of his total income. The Court concludes the amount of income disclosed by the Debtor for 2011 is not false. Moreover, the Court concludes there is no falsity in the disclosure as to the source of the income as the payments from PictureU during 2011 were made to RB and not the Debtor.

The Debtor's original SOFA shows 2012 year-to-date income of $90,000. The Debtor then amended the SOFA on November 15, 2012 to reflect year-to-date income of $190,880. PictureU's records show $190,880 paid to RB through September 2012. The Court concludes the Debtor's

statements as to 2012 income, as amended, are not false and no evidence was presented that any initial error in the amount was made with any intent to deceive.

Plaintiff alleges the Debtor should have disclosed income from other sources in response to SOFA Question No. 1. First, Plaintiff maintains the Debtor received income from Enterprise Incentive Services. But all payments from PictureU to Enterprise Incentive Services were made in 2009 which is not responsive to SOFA Question No. 1. Only journal entries were made by PictureU in 2010 to correct an entry regarding a 1099. The PictureU records show further that checks for Enterprise Incentive Services' work were made payable to Core Advisory Services. (Ex. 48). Income from Core Advisory Services was disclosed in the SOFA. The Debtor testified Enterprise Incentive Services was also a DBA and not a separate company. The Court concludes there were no false oaths made by the Debtor in response to SOFA Question No. 1 in connection with Enterprise Incentive Services.

Second, Plaintiff contends the Debtor should have identified UPE in response to SOFA Question No. 1. This is a name on the Debtor's 2009 tax return. But, 2009 income was not required to be disclosed in response to SOFA Question No. 1. Moreover, the tax ID number for UPE is the same as Phenix Global LLC and the Debtor's 2009 return shows no income from UPE. Therefore, the Court finds no false oath in connection with UPE and the Debtor's answer to SOFA Question No. 1.

Finally, Plaintiff maintains the Debtor should have identified income from eCabinetLiquidators.com in response to SOFA Question No. 1. The Debtor testified believably that eCabinetLiquidators.com is not a separate corporation but was a website and a Twitter handle used by the Debtor to help Advance Financial liquidate its collateral. No evidence was presented that the Debtor received income from eCabinetLiquidators.com in the relevant time period which should have been disclosed in response to SOFA Question No. 1.

The Court therefore concludes the Debtor's answer to SOFA Question No. 1, as amended, is not false, but, even if it is inconsistent with other documents, the Court concludes the Debtor had no intent to defraud or deceive any creditors. He tracked the information in his tax returns and the information is generally consistent with PictureU's records.

(b) *SOFA Question No. 18.* Plaintiff challenges the Debtor's response to SOFA Question No. 18. This question asks the debtor to identify "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5% or more of the voting or equity securities within six years immediately preceding the commencement of the case." In his original SOFA, the Debtor disclosed the following companies: RB, Walt Geer LLC, Core Advisory Services, and 16056 Inventory Management. The Debtor then amended the SOFA on November 1, 2012 to include Phenix Global LLC, PictureU, Phenix Home, and Phenix Direct LLC. This amendment was made after the Debtor's 341 meeting where these entities were discussed and where it became obvious to the Debtor and his counsel that SOFA Question No. 18 asked the Debtor to look back six years for the information, as opposed to just two years. The Court finds this explanation believable and concludes the Debtor's initial fail-

ure to identify those companies was not made with any intent to deceive.

Plaintiff insists the Debtor should have added eCabinetLiquidators.com, UPE, Enterprise Incentive Services, PictureU and eCompanyStore/Instawares Holding Company, LLC in his answer to SOFA Question No. 18. The Debtor testified he did not know what UPE was. The Court concludes any omission by the Debtor in listing UPE was not material, not knowing, and not fraudulent.

■ As to eCabinetLiquidators.com, it is questionable whether eCabinetLiquidators.com as just a website and Twitter handle would need to be identified in response to Question No. 18. But even if it technically meets the terms of Question No. 18 and should have been disclosed, the Court concludes Plaintiff did not prove the failure to disclose eCabinetLiquidators.com was knowing and fraudulent, or that it was material since it sold Advance Financials' collateral.

Next, Plaintiff argues the Debtor should have identified Enterprise Incentive Services in response to SOFA Question No. 18. The Debtor stipulated Enterprise Incentive Services was another DBA he used. Certainly, this information would have been responsive to SOFA Question No. 18. However, as discussed above, all payments from PictureU for work done by "Enterprise Incentive Services" were made payable to Core Advisory Services. (Ex. 48). The Debtor listed Core Advisory Services in response to SOFA Question No. 18. The Court therefore finds that, even if the information should have been provided, it was not omitted knowingly and fraudulently with intent to deceive.

■ Plaintiff also opines the Debtor should have disclosed he was president of PictureU. The Debtor stipulated he served as interim president of PictureU

pursuant to an agreement signed in March 2009. The Debtor testified he was only a contract executive in his role as a consultant through RB, as opposed to a corporate officer, so he did not list PictureU in the SOFA. Even as a contract executive, the Debtor's position with PictureU should have been disclosed in answer to SOFA Question No. 18. The information is material. Nevertheless, the Court concludes the omission was not fraudulent. The Debtor's testimony was correct; he was not a corporate officer. The Court accepts the Debtor's explanation for why the information was not disclosed. Moreover, the Debtor readily testified in his 341 meeting that he served as president of PictureU, so there is no evidence the information was withheld to deceive.

Finally, Plaintiff complains eCompanyStore/Instawares Holding Company, LLC should have been identified in response to SOFA Question No. 18. The Debtor testified he resigned from eCompanyStore in December 2003 and was no longer an officer, director, partner, or managing executive of eCompanyStore. Although the Debtor held more than 50% of the common stock in 2000, he testified his interest was gradually diluted to 2–3% by 2009 and eliminated in 2010. No contrary evidence was presented.

The Court concludes Plaintiff did not prove the Debtor made a false oath in response to SOFA Question No. 18 such as to deny him a discharge under 11 U.S.C. § 727(a)(4).

(c) *Schedule B, Question No. 13.* Plaintiff claims the Debtor made a false oath in responding to Question No. 13 on Schedule B which asks the Debtor to identify stock and interests in incorporated and unincorporated businesses. The Debtor only identified his interest in RB and in Walt Geer LLC and never amended this schedule. Plaintiff contends the Debtor should

have identified his interest in UPE, eCabinetLiquidators.com, Enterprise Incentive Services, Enterprise Incentive Solutions, Core Advisory Services, Phenix Global LLC, Phenix Home, Phenix Direct LLC and PictureU.

Importantly, Schedule B, Question No. 13 asks the debtor to identify his interests in businesses which the debtor holds as of the petition date, not a disclosure of interests which the debtor previously held. First, the Court finds any interest the Debtor previously held in Phenix Global, Phenix Home and Phenix Direct LLC had been functionally eliminated by the petition date since the companies no longer operated. Secondly, the Debtor used Core Advisory Services and Enterprise Incentive Services Inc. as DBA's and there is no "interest" to disclose. Moreover, there was no evidence either of those names was in use at the petition date. Third, the Debtor does not know what UPE is. There was no evidence presented that the Debtor at the time of the petition owned any interest in UPE. Fourth, eCabinetLiquidators.com is not a business but a website through which the Debtor assisted Advance Financial in liquidating its collateral.

Fifth, Plaintiff alleges the Debtor held a stock or other interest in PictureU which should have been disclosed in response to this question. The Debtor served as PictureU's president, through RB. The Debtor told various people he was an "owner" or a "partner" in the business, or in the process of buying "a controlling interest". (Exs. 58, 59, 60). Two of these emails were to women he was trying to impress on online dating services. The Debtor admitted at trial these statements to his potential dates were untrue. Plaintiff presented testimony from the Debtor's father who stated "he believed" the Debtor held an equity interest. But Plaintiff nev-

er presented any direct evidence that the Debtor owned any interest in PictureU. Ownership is an objective fact that Plaintiff could have proven. He did not. The Debtor's unsworn puffing is not evidence of the real facts. The Court cannot conclude the Debtor made a false oath.

Next, Jay Flowers testified he had given the Debtor a 1% interest in Enterprise Incentive Solutions. The Debtor was genuinely surprised at this testimony since he had never received a K–1 from the company. Although the Debtor should have listed the stock in answer to Question No. 13, the Court concludes his omission was not knowing or fraudulent, since the Debtor was unaware he held such an interest until the trial.

The Debtor did not disclose any interest in eCompanyStore/Instawares Holding Company, LLC on his Schedules. The Debtor testified adamantly he did not own any stock in eCompanyStore so did not disclose any interest in eCompanyStore in his Schedules. He testified his shares had been diluted to 2 to 3% of the company in 2009. Then, in 2010, eCompanyStore merged into Instawares Holding Company, LLC and his shares were wiped out. Plaintiff could have proved the Debtor lied by proving the objective fact of whether the Debtor owned the shares, but did not do so. Although the Divorce Decree raises questions, the Court concludes Plaintiff did not prove the Debtor in fact owned any shares in eCompanyStore.

Plaintiff also asserts the value of the Debtor's interest in RB and Walt Geer LLC is understated. In the Debtor's Divorce Decree, he was ordered to pay his ex-wife the sum of $4,000 "from" the Debtor's business interests in RB, Walt Geer LLC, Core Advisory Services, Phenix Home, Core Rewards and 16056 Inventory Management LLC. Plaintiff suggests this paragraph sets the value of those interests

in excess of $4,000. It is possible the value of those interests was in excess of $4,000, but given the testimony presented, the Court finds it more likely that the amount of $4,000 to be paid under the Divorce Decree was simply a matter of negotiation between the Debtor and his wife. The Divorce Decree is not a finding by a court that the Debtor held an interest in those businesses or that the businesses were worth more than $4,000. The Debtor testified the values he placed on RB and Walt Geer LLC in the schedules were the bank account balances of each. Since neither entity owned any hard assets, the Court concludes the value set was not false, or even if inaccurate, the value was not knowingly and fraudulently misstated.

(d) *Schedule B Question No. 12.* Plaintiff avers the Debtor made a false oath when he failed to disclose the 401(k) he held at eCompanyStore in response to Question No. 12 on Schedule B. The Debtor amended his Schedules on November 1, 2012 to add the 401(k). The topic of the 401(k) came up at the 341 meeting. The Debtor's attorney stated he had understood the 401(k) was provided to the Debtor's ex-wife pursuant to the Divorce Decree. When the Debtor clarified to his brother/attorney that was not the case, the Schedules were amended. So while the answer to Schedule B, Question No. 12 was not originally correct, the Court finds it was corrected promptly and the evidence shows the Debtor had no intent to deceive in failing to disclose this information. Rather, the omission with respect to the 401(k) appears to have been largely his brother's mistake.

■ (e) *Reading Schedules.* When the Debtor filed his Schedules and SOFA, the Debtor signed a "Declaration under Penalty of Perjury by Individual Debtor" which states as follows: "I declare under penalty of perjury that I have read the foregoing summary and schedules consisting of 21 sheets, and that they are true and correct to the best of my knowledge, information and belief." Despite having signed this declaration, the Debtor testified at trial that he did not completely read the Schedules and SOFA either as originally filed or as amended. He only "glanced over it". Plaintiff charges that, because the Debtor did not thoroughly review the SOFA and Schedules, his Declaration is false.

Obviously, the Court and the Debtor's creditors rely on the Schedules and SOFA to be complete and correct. A failure by the Debtor to completely review the Schedules and SOFA leads to situations such as this where there are omissions and allegations that the omissions were deceptive and knowing. The false oath required for denial of discharge, however, requires that a statement not only be made falsely under oath, but that it be material to the debtor's business transactions or estate, or concern the discovery of assets, business dealings or the existence or disposition of property. The Declaration made under penalty of perjury is not the type of "material" statement which justifies denial of a discharge. If there were no misstatements in the Schedules and SOFA, a debtor's failure to fully read the Schedules and SOFA, while signing the Declaration under penalty of perjury, would not be the type of "false oath" that justifies the denial of a discharge. Moreover, there was no evidence presented that the Debtor's failure to thoroughly read the Schedules and SOFA was a result of a fraudulent intent. The Debtor's failure to read the Schedules and SOFA was sloppy and irresponsible, but penalizes only him. His failure to review them thoroughly led to this litigation. The Court concludes any falsity in his execution of the Declaration that he read the Schedules and SOFA does not

justify denial of discharge under 11 U.S.C. § 727.

## MISCELLANEOUS ALLEGED FALSE OATHS IN TESTIMONY

In addition to the alleged false oaths discussed above, Plaintiff alleges the Debtor testified falsely at his 341 meeting and at various depositions as follows:

■ (a) *Use of eCompanyLiquidators.com.* Plaintiff contends the Debtor gave false testimony at his 341 meeting by stating he had not used eCabinetLiquidators.com. (See Ex. 1, p. 71). When the Debtor was cross-examined at trial and shown evidence that eCabinetLiquidators.com was referenced in e-mails and tweets in 2009, the Debtor's response was that the name had been used more than three years prior and was primarily used by Rick Leaman to assist in the liquidation of the Advance Financial collateral. The Court concludes the 341 testimony was false, but Plaintiff has not shown that information regarding eCabinetLiquidators.com was material to determining the *Debtor's* assets and liabilities. The website was a mechanism for disposing of Advance Financial's collateral, rather than property of the Debtor.

(b) *Transacting business with Phenix Home after it was closed.* In the Debtor's 341 meeting, he testified that Phenix Home was shut down by Trivest in early 2009 (February, March or April). Plaintiff's counsel then asked the following question: "And then at that point you had nothing further to do with Phenix Home Source; correct?" Answer: "Not with Phenix Home Source, no." (Ex. 1, p. 15).

Notwithstanding this testimony, Stipulated Fact No. 93 states, "Between June and December 2009, the Debtor wrote 19 checks on Phenix accounts (including one check for more than $1,000 made payable to the Debtor personally), that disbursed

in excess of $65,000." The Debtor testified the checks were written to creditors of Phenix Home. He does not have a specific recollection of the purpose of the $1,000 payment made to him, but believes it was reimbursement of expenses. Copies of the checks were not introduced at the trial so the Court is unable to determine independently why the checks were written. No evidence was presented to contradict the Debtor's testimony.

Plaintiff also pointed to Exhibit 103 as evidence the Debtor's 341 testimony was false. Exhibit 103 is an unexecuted copy of a bill of sale from Phenix Home to Walt Geer LLC of inventory of Phenix Home. The Debtor testified that, even though this copy of the bill of sale was not signed, the Phenix Home inventory which was collateral of Advance Financial was transferred to Walt Geer LLC in order to assist Advance Financial in the sale of the inventory. The Debtor testified he understood Advance Financial "advanced" funds to Walt Geer LLC so it could "buy" the inventory, with the advanced funds being used to mark Phenix Home's debt paid in full and leaving Walt Geer LLC liable to Advance Financial.

While the Debtor's testimony at the 341 could be construed in the way Plaintiff argues, the Court believes, when reviewing the testimony as a whole, that Debtor's answer (he had nothing more to do with Phenix Home) meant "nothing more to do" with it operationally. The Debtor testified throughout the 341, and in all of his depositions, regarding the efforts he made to wind down Phenix Home. While 19 checks is not insignificant, without copies of the checks or other evidence to dispute they were payments to creditors as part of the wind down of Phenix Home, the Court cannot conclude the statement made by the Debtor at his 341 meeting was false.

Therefore, it forms no basis for denial of the Debtor's discharge.

(c) *Debtor's agreement with PictureU.* At the Debtor's 341 meeting, Plaintiff's counsel asked the following:

Q: There was originally a written contract [with PictureU]?

A: When I first started in 2009 I had a letter of agreement, yes, between me and PictureU; that's correct.

Q: So originally it was a contract between you personally and PictureU?

A: That is correct.

. . .

Q: Well, how was it that PictureU went from hiring you to hiring Red Barchetta?

A: The original deal was scheduled to end on December 31, 2009, and the owner asked me to stay on and I told him he'd have to sign the deal with Red Barchetta, so I worked for them.

(Ex. 1, pp. 46–47). Plaintiff introduced into evidence an unsigned Management Advisory Agreement dated March 1, 2009, between Enterprise Incentive Solutions, Inc. d/b/a Core Advisory Services and PictureU pursuant to which the Debtor was to serve as interim president for a period ending December 31, 2009. (Ex. 39). Plaintiff also introduced a second unsigned Management Advisory Agreement, this time between Walt Geer d/b/a Core Advisory Services and PictureU, extending the term of the original agreement through December 31, 2010. (Ex. 45). The second agreement provides that Enterprise Incentive Solutions "hereby assigns the original agreement to Walt Geer d/b/a Core Advisory Services." Stipulated Fact No. 54 confirms that "the Debtor negotiated and signed a March 2009 agreement with PictureU on behalf of Enterprise Incentive Solutions, Inc., pursuant to which he agreed to serve as the interim president of PictureU through December 31, 2009." Enterprise Incentive Solutions, Inc. was a company owned by Jay Flowers, one of the Debtor's friends. Consequently, Plaintiff reasons the Debtor's statement at the 341 meeting that the PictureU agreement was with the Debtor personally is false.

Although the statement appears to be in error when compared to Exhibit 39 and Stipulated Fact No. 54, the Court notes the Debtor's statement is consistent with PictureU's financial records. They show that from early 2009 through September 2010 all payments were made to the Debtor personally or to Core Advisory Services, through which the Debtor acted as his DBA. PictureU's records reflect that it never made a payment to Enterprise Incentive Solutions, Inc. for consulting fees. The Court therefore concludes that, although the Debtor may have been mistaken in his 341 testimony, his mistake is understandable given that checks were made payable to him personally. Moreover, Plaintiff did not prove the Debtor made the misstatement knowingly and with any intent to deceive.

Similarly, Plaintiff asserts the Debtor made a false oath at his 341 meeting when he stated he told PictureU to hire RB in 2009. The facts show that RB was not formed until 2010 and the first payment to RB for the Debtor's consulting services was in October 2010. Once again, it appears the Debtor's testimony was in error. However, it is not clear that the date of the switch to RB was material in terms of discovering the Debtor's assets, property transfers, and liabilities. The *fact* the Debtor testified to remains correct, which is that the Debtor instructed PictureU to begin making payments to RB. Moreover, there is no evidence to suggest the Debtor's statement that the year was 2009, rather than 2010, was made knowingly and

with any intent to deceive. Neither of these statements supports a denial of the Debtor's discharge under 11 U.S.C. § 727.

(d) *Sale of Phenix inventory.* The Debtor testified at his 341 as follows:

Q: Isn't it true, sir, that after, quote, Trivest closed the business, you continued to sell the inventory?

A: Walt Geer LLC had the inventory with the loan against it, and that guy who had that loan eventually foreclosed on it.

Q: So did you continue to sell the inventory?

A: Inventory was sold.

Q: And you made a profit off of selling that inventory; correct?

A: No. The guy who had the loan against it took the payments.

Q: So you made no money off of selling that inventory?

A: No.

(Ex. 1, p. 70). Plaintiff suggests this testimony was false, pointing specifically to Exhibit 110 which was obtained from the Debtor's computer showing the sale of certain product which would allegedly result in a profit to each of the Debtor and Jay Flowers of $84,078.96.

As noted previously, the inventory of Phenix Home was collateral for the loan from Advance Financial, on which the Debtor was a guarantor. The Debtor testified consistently that the funds obtained from the sale of the inventory which was Advance Financial's collateral were paid to Advance Financial.

The Debtor testified that Exhibit 110 reflects a separate transaction dealing with a sale, but not of Phenix Home's inventory. The Debtor testified that as Phenix Home closed, a former customer of Phenix Home had need for a particular product which Phenix Home did not have. There was an opportunity to fill that request through contacts with Phenix Home's prior suppliers. The Debtor testified he "offered the opportunity" to Jay Flowers and other directors, but that Jay Flowers was the only one interested in consummating the transaction. Jay Flowers purchased the product from former Phenix Home suppliers and sold it to a former Phenix Home customer. The Debtor testified he and Jay Flowers profited on that sale, but not in the amount they had estimated of over $84,000 each. The Debtor consistently stated, and there was no evidence to contradict, that the product sold was not Phenix Home's inventory.

The Court concludes the Debtor spoke truthfully when he stated he did not make a profit on the sale of Phenix Home's inventory. Plaintiff failed to prove the Debtor made a false oath which justifies denial of his discharge.

(e) *Precision Cabinets as a tenant.* The Debtor testified at his 341 meeting regarding a company called Precision Cabinets as follows:

Q: Well, you were the landlord, when did he start the business?

A: I wasn't the landlord; Chris Tierney was the landlord; he was the receiver for the court to take the building.

Q: But you said, sir—I thought we established the building wasn't taken until 2010?

A: I don't know when it was taken; I'm just telling you when I met with Tierney when he took over.

Q: So you never entered into any lease agreement on behalf of anyone with Mr. Morris or his company; is that your testimony?

A: I don't recall having a lease with Mr. Morris.

(Ex. 1, p. 78). Plaintiff introduced Exhibits 117 and 118 to demonstrate that the Debtor's testimony was false. Plaintiff's Exhibit 117 is an unsigned lease agreement dated December 29, 2009 between Walt Geer LLC and Precision Cabinet Works for a month-to-month lease beginning January 1, 2010. Plaintiff's Exhibit 118 is an unexecuted lease dated September 27, 2010 between Walt Geer LLC and Precision Cabinet Works for a term beginning October 1, 2010 and ending December 31, 2010. Plaintiff also points to Stipulated Fact No. 76 which provides, "On behalf of Walt Geer LLC, the Debtor executed two written leases (December 29, 2009 and September 27, 2010) with Precision Cabinets for the Hood Road Property." Plaintiff contends the Debtor lied at his 341 meeting.

At the 341 meeting, Plaintiff's counsel's question to the Debtor was "*you* were the landlord?" (emphasis added). First, the Court notes the Debtor testified Walt Geer LLC was the owner and the leases offered by Plaintiff are in the LLC's name, not the Debtor's name. The Court has found earlier in this opinion that the Hood Road Property was actually in the name of Walt Geer individually, although the Debtor was unaware of it. To the extent the Debtor's denial that he personally was the landlord of Precision Cabinets was an error, the Court concludes that statement, even if false, was not made knowingly and with intent to deceive.

But more importantly, the full context of the Debtor's testimony is that the real party-in-interest with respect to the building at this point in time was the receiver for Power Lending which held the lien on the Hood Road Property. As explained above, Power Lending made a loan to Walt Geer LLC to enable the purchase of the building and the Debtor individually guaranteed the loan. The Debtor was in default to Power Lending, but was negotiating a workout arrangement. Power Lending then defaulted on its loan to RBC. RBC had Chris Tierney appointed as receiver for Power Lending. The Debtor testified he met with Chris Tierney in 2009 and that Chris Tierney, as the receiver for Power Lending, rejected any workout proposals. Although RBC, acting on behalf of Power Lending, did not foreclose on the Hood Road Property until November 2011, the Debtor's testimony makes clear that in his mind he was working for the receiver.

The Court concludes that, even if the Debtor's testimony at the 341 meeting was technically false in terms of the identity of the landlord (the Debtor, Walt Geer LLC, or the receiver), the Debtor's statement was not made with an intent to deceive because of his understanding of the receiver's role. The Debtor made clear that his actions were being taken at the behest of the receiver and in conjunction with the receiver. The Debtor also testified that any money he received from Precision Cabinets was paid directly to the receiver toward the Power Lending debt and/or Advance Financial to the extent Precision Cabinets sold some of Advance Financial's inventory. No evidence was presented that the Debtor personally profited from any leasing arrangement with Precision Cabinets.

(f) *Liabilities did not exceed assets.* Plaintiff charges the Debtor made a false oath with respect to his insolvency which Plaintiff contends is a badge of fraud. Plaintiff's counsel asked the Debtor at the trial whether he was insolvent at any time from August 2010 through the date the petition was filed and the Debtor responded, "I don't know." Nevertheless, at the Debtor's 2004 examination on March 7, 2013, the Debtor answered (after a lengthy examination on this point from Plaintiff's

counsel) that Plaintiff's counsel was correct; the Debtor was insolvent from August 2010 through the petition date. (Ex. 2, p. 66). The Court does not believe the difference between "I don't know" and the Debtor's response "correct", after a very lengthy examination by Plaintiff's counsel, are inconsistent or make either testimony false.

Plaintiff also questions Debtor's response to the question of whether "at any time his assets exceeded his liabilities." When this question was asked at trial, the Court directed that the question was too broad as it did not designate a particular time period. At the 2004 examination held on March 7, 2013, the Debtor was asked whether he could *name* any time when his assets exceeded his liabilities and he responded "no". (Ex. 2, p. 62–63). First, this question is not the same as whether in fact the assets ever exceeded the liabilities. Second, the question as asked both at the deposition and at the trial was exceedingly broad and misleading to the Debtor. Third, the Court notes the Debtor's insolvency, while relevant, is not material in this context. The Debtor's solvency is not an element of any cause of action brought by Plaintiff. Rather, Plaintiff wanted to establish insolvency as a badge of the Debtor's alleged fraudulent intent in taking certain actions. Fourth, the Court notes that whether a debtor is insolvent is frequently a complex analysis, especially when contingent obligations such as the Debtor's are at issue. *See Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 910–11 (Bankr.N.D.Ga.2013). The Court concludes the Debtor's responses, even if inconsistent, are insufficient to bar the Debtor's discharge.

### CONCLUSION

The Court is disturbed by a number of items in this case:

- The Debtor's original counsel not thoroughly examining the information that he was provided by the Debtor, a prime example being the Divorce Decree. The Debtor and his brother likely believed each knew more than he did;

- The Debtor's less than voluntary testimony, requiring Plaintiff to ask multiple questions to get at the truth, but to which the Debtor ultimately testified;

- "Overthinking" by the Debtor, his advisors, friends and family to try and "protect" a garden-variety payment by the Debtor under his Divorce Decree;

- Plaintiff's failure to provide objective evidence from a third party to prove some of the alleged falsehoods made by the Debtor, an example being the Debtor's alleged ownership in certain entities;

- Plaintiff's scorched earth and overzealous prosecution of this matter, turning a garden-variety payment under a divorce decree into lengthy and expensive discharge litigation.

The Court has examined each of Plaintiff's allegations in detail in this opinion and found them individually to be insufficient to deny the Debtor a discharge. Plaintiff urges the Court to review the sum of the acts, arguing the number of omissions creates a total picture of fraud or at least such a reckless indifference to the truth as to support a finding of fraudulent intent. The Court has reviewed the admitted evidence, the Stipulated Facts, and the testimony and arguments at the trial.

When reviewed as a whole, the facts reveal a man who made a solid, but not outrageous income; who had a nice, but not outlandish house; who spent all his money on living expenses for himself, his

ex-wife and kids, none of which was proven to be inappropriate or frivolous for a person of that income level or to evidence a change in spending patterns; and who acquired no assets with that income other than a house, which apparently had no value to creditors after liens and exemptions are considered. The "transfers" complained of by Plaintiff were potential preference payments to creditors including taxing authorities, his ex-wife, and his father. But no one challenged the validity of the expenses. The income allegedly "concealed" was paid directly to the Debtor or to the Debtor's creditors and no assets were purchased, hidden or concealed. The allegedly omitted or erroneous disclosures on the SOFA and Schedules generally were either disclosed elsewhere in the Schedules (such as Schedule F) or at the 341 meeting or were not responsive to the SOFA or Schedule questions.

The only troubling transactions here are the payment to Ann of $29,000 between July and September 2012, the loan by Jay Flowers of $35,500 to the GFT which was then provided to Ann, and the repayment by Ann of $20,000 to the GFT. These transactions are only suspicious because of the unnecessarily elaborate way(s) they were described by the Debtor, not because there is anything inherently wrong with them. The Debtor paid money that was owed to his ex-wife under the Divorce Decree, helped her get a new house in which he has no interest, and kept a house which has little or no value for creditors and on which he has always been and remains solely liable.

To deny a debtor a discharge requires culpable intent, intent to deceive and intent to defraud. As the court in *In re Watkins* stated,

> Denial of discharge is in particular meant to be an extreme imposition of a sanction, to be imposed upon relatively bad people who have consistently done bad things; not so bad people who have done fairly seriously bad things in certain circumstances; or anyone who has done one really bad thing which permeates and precludes the effective administration of a bankruptcy case. It is not meant to be imposed upon an individual who was lax or careless in the conducting of financial affairs or the keeping of records in relation to them—in other words, people whose conduct may fall short of strict technical legal requirements but do not evidence the intent of figuratively thumbing their noses at their creditors, bankruptcy trustees and/or the court.

474 B.R. at 642. There is simply no deception here—not on an individual allegation basis and not when the transactions are viewed as a whole. The Court therefore rules in favor of the Debtor and grants the Debtor a discharge on all allegations.

**IT IS ORDERED.**